A. M. BERRY *v.* FRED L. FOX, *Tax Commissioner, et al.*

(No. 7861)

Submitted January 10, 1934.   Decided January 16, 1934.

Woods, President, and Hatcher, Judge, dissenting.

*Brown, Jackson & Knight* and *Price, Smith & Spilman,* for appellant.

*Homer A. Holt,* Attorney General, *Ira J. Partlow,* Assistant Attorney General, and *Fred L. Fox,* for appellees.

Maxwell, Judge:

The legislature on the 9th of December, 1933, passed an Act known as Committee Substitute for House Bill No. 64, effective from passage, which purported to appropriate from the general revenues of the state from taxes imposed by the legislature on privileges, franchises and incomes of persons and corporations for the fiscal years ending June 30, 1934, and June 30, 1935, respectively, such moneys as may be required to meet all interest and sinking fund charges due and to become due during the said years upon bonded indebtedness of all counties, magisterial, school and other taxing districts except municipalities, incurred prior to November 8, 1932, for roads now used as a part of the state road system, and incurred for schools now used as a part of the state free school system.

The plaintiff, A. M. Berry, a resident and taxpayer of Salt Lick District, Braxton County, challenges the constitutionality of the said enactment, and seeks to void the acts of the sinking fund commission and its secretary in drawing requisitions on

the state auditor for warrants with which to discharge bonds, and interest thereon, issued by two taxing units in Fayette County, as well as the act of the auditor in issuing the warrants, and to enjoin the state treasurer from honoring and paying them.

The bill of complaint embodies the provisions of the Act and alleges that certain bonds issued by Falls District, Fayette County, prior to November 8, 1932, for schools, and certain bonds issued by Sewell Mountain District prior to November 8, 1932, for roads, and interest thereon, are due or about to become due; that there are moneys in the General Revenue Fund of the state treasury which, under the provisions of the aforesaid act, are subject to requisition of the state sinking fund commission and which arise from taxes imposed by the legislature on privileges, franchises, and incomes of persons or corporations as authorized by Article X, section 1, of the state Constitution, as amended, sufficient to pay said bonds and interest charges thereon; that the secretary of the state sinking fund commission, pursuant to that commission's direction, has drawn requisitions upon the state auditor for funds to pay the bonds and interest charges; that the state auditor has issued warrants therefor payable to the said commission; that the state treasurer has expressed his intention to honor the warrants and pay them out of the treasury; that the plaintiff will have to pay to the state a substantial sum of money as taxes imposed by the legislature on privileges, franchises, and incomes; that Salt Lick District has issued no bonds for roads or schools; that neither his property in Salt Lick District nor the taxes to be paid by him hereafter on privileges, franchises, or incomes are legally liable for or properly applicable to the payment of said bonds and interest charges; that plaintiff had no voice in the issuance of said bonds and owns no property in either of the districts which issued the bonds; that the Act is violative of sections 4, 5 and 6, of Article X, and section 10 of Article III, Constitution of West Virginia, and section 1 of the Fourteenth Amendment of the Constitution of the United States; and that the acts of the sinking fund commission and its secretary and of the auditor, as well as the contemplated action of the treasurer, are without legal authority and to plaintiff's irre-

parable injury and damage.

The circuit court of Kanawha County sustained the defendants' demurrer and dismissed the bill. The plaintiff has appealed.

Section 6, Article X of the Constitution of West Virginia reads:

"The credit of the State shall not be granted to or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State, or elsewhere, formed for any purpose whatever."

In justification of the suggestion that the state may undertake the payment of sinking fund and interest charges upon county and magisterial district road bonds without violating said constitutional provision against the assumption of debt by the state, reference has been made to certain observations in the opinion in the case of *State Road Commission* v. *County Court of Kanawha County*, 112 W. Va. 98, at page 106, 163 S. E. 815, 818, wherein, in reference to said section 6, it is said:

"In the debates at the Wheeling Convention which formulated this provision, the discussion related solely to state aid or credit to corporations for local and sectional improvements. See manuscript report of the convention, for the period February 1st to February 4th, inclusive, 1862, Department of Archives and History. See also sketch 'Formation of West Virginia,' 1 W. Va. Law Reports 72. The language as well as the history of the section demonstrate that it has reference to state aid and state payments in matters of territorial interest to the county, and not to a situation like this where the advancement made the county by the state is essentially in the interests of the entire state."

In that case we had under consideration section 31, chapter 6, Acts 1923, which authorizes the state road commission to acquire lands "for the purpose of constructing, widening, straightening, grading or altering any state road", and requires the county court of the county wherein such road is

situated to pay for the lands so acquired. The definite question for decision was whether the state road commission could recover from the county court of Kanawha County the amounts which had been paid by the commission for lands in Kanawha County acquired by the commission for state road purposes. The case did not directly involve the question of the granting of the state's credit to a county. So that what was said in the opinion *arguendo* in the portion to which reference has been made, we do not deem conclusive of the questions now precisely before us.

The immediate precursor of said section 6, Article X of our present Constitution, was section 6, Article VIII of the Constitution of 1863. That section read:

> "The credit of the State shall not be granted to, or in aid of, any county, city, town, township, corporation, or person; nor shall the State ever assume or become responsible for the debts or liabilities of any county, city, town, township, corporation, or person, unless incurred in time of war or insurrection for the benefit of the State."

It will be noted that down to and including the words "corporation, or person", where they appear the second time, the two sections are identical except that the word "town" which appears in the old section was not carried into the new one.

The convention which wrote our first Constitution, known as the Constitution of 1863, convened at Wheeling on the 26th of November, 1861, and its first session continued until February 12, 1862. On January 31, 1862, the committee on taxation and finance made its report to the convention presenting several sections which, in the form finally adopted, became Article VIII of the Constitution. It is pertinent here to make reference to sections 5 and 6 of that report. Those sections, as reported, read:

> "5. No debt shall be contracted by this State except to meet casual deficits in the revenue—to redeem a previous liability of the State—to suppress insurrection, repel invasion or defend the State in time of war.
> "6. The credit of the State shall not be granted to, or in aid of, any county, city, town, township, corporation or person whatever; nor shall the State

> ever assume or become responsible for the debts or liabilities of any county, city, town, township, corporation or person, unless incurred in time of war or insurrection for the benefit of the State."

Certain proposed amendments of these sections occasioned extended debates. The attempted amendments pertained to internal improvements. A strong element of the convention favored the framing of these sections so as to permit the state to underwrite works of internal improvement undertaken by private corporations. The motion of the delegate from Doddridge County to amend section 6 by striking therefrom the words "corporation, or person" was lost by one vote after an extended discussion.

The debates on these two sections occupied most of the time of the convention from February 1st to 4th. The sole controversial question was whether the state should be prohibited from extending its credit to private enterprise engaged in internal improvements. No delegate seems to have questioned—for apparently it was taken for granted by everyone—that the credit of the state should not in any event be extended to counties, cities, towns, townships or persons, or their debts assumed, as prohibited by section 6. The only debated subject was corporations. That section as reported to the convention and as carried into the Constitution embraced alike all of the agencies and persons named, including corporations. The ban applied in the same degree to all. It does not follow from the fact that only internal improvement corporations figured in the debates that they constituted the only subject or agency sought to be affected by the fixed limitations which the said sections impose. All named subjects were aimed at specifically and unequivocally. There were differences of opinion among convention delegates as to corporations, but the minutes of the convention do not disclose any such difference as to the other subjects. The said sections five and six were finally adopted in the exact form in which they had been reported to the convention by the Committee on Taxation and Finance. The observations herein made with reference to the said constitutional convention are based on the manuscript report thereof to be found in the state department of Archives and History.

In the Historical Sketch of the Formation of the State of West Virginia appearing in Volume One of the State Reports, it is stated at page 72 that under the state Constitution (1863), "Taxation was made equal and uniform for the first time in the history of this people. A check was placed upon the system of granting the credit of the state to corporations, which had enthralled Virginia in a debt of millions." The check referred to is that of section 6, Article VIII. The same section also placed a prohibition upon the state's assuming the debts of its governmental subdivisions. The writer of the sketch saw fit to mention the former and not the latter, but this should in no degree becloud the facts as to what was actually done, nor cast doubt upon the plain meaning of the words employed.

Unless plain and simple words have lost their meaning, section 6 of Article X of our present Constitution prohibits the legislature from granting the credit of the state or assuming debts and liabilities such as are in said section indicated, whether such assumption be done directly and unequivocally or by indirection.

Neither is it perceived that this situation is in any wise affected by the Good Roads Amendments of 1920 and 1928, respectively. The underlying purpose of those two amendments was the authorization of the issuance of state bonds to finance an extended program of state highway construction. They authorized the legislature to provide a state revenue to build, construct and maintain, or assist in constructing and maintaining a system of state roads. The manner in which such revenue may be provided is not circumscribed by the amendment; the authorization of state bonds is not exclusive of other methods, as, for example, the gasoline tax which has been used extensively in producing revenue to retire state bonds. But the revenue contemplated is to be applied only to the uses specified in the said amendments. Whether within the meaning of the word "assist", as used in the amendment, the state might have borne part of the expense of constructing county-district roads, need not be here considered. But even if such could have been done, that would have been a very different matter from undertaking to assume the payment of local bonds for purely local undertakings. This would require the

state to assume the burden of indebtedness in the incurring whereof it had no voice. These amendments do not modify nor impair the provisions of section 6, Article X of the Constitution, because they do not undertake to grant the credit of the state to or in aid of any county, city, township, corporation or person, nor do they authorize the assumption by the state of any debt not contracted by it.

In the case of *Bates* v. *State Bridge Commission,* 109 W. Va. 186, 153 S. E. 305, we had under consideration the constitutionality of chapter 8, Acts 1929, which created the state bridge commission and defined its powers and duties. The Act contemplated the construction or purchase of bridges and the paying therefor solely from tolls derived from the bridges. It was charged that the act violated the letter and spirit of section 4, Article X of the Constitution which provides that "no debt shall be contracted by this state, except to meet casual deficits in the revenue, to redeem a previous liability * * *, to suppress insurrection, repel invasion or defend the State in time of war." We did not sustain that contention because we were of opinion, supported by general authority, that bonds of the state payable solely out of revenue derived from the bridge tolls did not create debt within the constitutional inhibition against the contraction of public debt, but partook more of the nature of purchase money mortgages. Such bonds do not pledge the credit of the state. It does not seem, therefore, that that case is at all comparable with the case at bar or that the former affords a precedent for the present one.

In construing the tax limitation amendment (section 1, Article X, State Constitution), adopted by the people at the General Election of November 8, 1932, other provisions of the Constitution cannot be ignored. "A clause in a constitutional amendment will prevail over a provision of the original instrument inconsistent with the amendment, for an amendment to the constitution becomes a part of the fundamental law, and its operation and effect cannot be limited or controlled by previous constitutions or laws that may be in conflict with it. But repeal of constitutional provisions by implication is not favored, and an amendment should not be construed as affecting any greater innovation on the existing constitution

than is reasonably necessary to accomplish the object of its enactment.'' 12 Corpus Juris, page 709. We said in *Finlayson* v. *City of Shinnston*, 113 W. Va. 434, 168 S. E. 479, speaking of said amendment: ''Other provisions of the state constitution must be construed in the light of the amendment.'' But that statement is not to be taken to mean that constitutional light is to be derived only from the amendment. A constitutional ·amendment, as the last word from the people on a subject under consideration, should be given controlling effect where there is irreconcilable conflict between it and other constitutional provisions, but no such effect should be given where it and other provisions of the Constitution may be read together and harmonized without destroying the effect and purpose of any of them. This proposition of constitutional law is concisely dealt with in Cooley's Constitutional Limitations (8th Ed.), Vol. 1, page 129, as follows:

> ''Upon the adoption of an amendment to a constitution, the amendment becomes a part thereof; as much so as if it had been originally incorporated in the constitution; and it is to be construed accordingly. If possible, it must be harmonized with all the other provisions of the constitution. If this cannot be done, the amendment will prevail.''

A constitutional inhibition as positive as language can make it (Article X, section 6), should not be deemed destroyed by forced implication arising from an amendment of another section of the organic law.

In support of the legislative enactment challenged in this proceeding much emphasis is laid upon that portion of the recent constitutional amendment (section 1, Article X, West Virginia Constitution amended by vote of the people November 8, 1932) which provides that such revenues as may be derived from an income tax authorized by said amendment ''may be appropriated as the legislature may provide.'' The position is taken that this is a carte blanche authorization of the legislature to use such revenue for public purposes as it may desire, and that therefore it may apply any part thereof to the payment of local school and road bonds. We cannot accept that view. The application of such revenue by the legislature must be in conformity with other constitutional

requirements not at variance with the said amendment. The several provisions of a constitution must be considered together, and an older provision will be destroyed by a later one only where there is irreconcilable conflict. We are not satisfied that such conflict appears here. A situation of difficulty and complexity does not justify discarding plain constitutional inhibitions.

It is true that legislative interpretation of a constitutional provision, particularly when made almost contemporaneously with the adoption of the provision, is entitled to great deference (*Road Commission* v. *County Court,* 112 W. Va. 98, 163 S. E. 815), but the recent case of *Bee* v. *City of Huntington,* 114 W. Va. 40, 171 S. E. 539, is conclusive authority for the proposition that such interpretation cannot be deemed final.

The conclusion, therefore, seems inevitable that section 6, Article X of the Constitution of West Virginia, stands against the validity of the act in question. It is an obvious and unequivocal meaning of that provision of our organic law that the burden of bonded indebtedness shall be borne by the governmental unit which contracted it. It would be no more unfair to require a man's neighbors to help pay his debts than to require numerous communities to help pay the debts of a particular one.

As basis of justification of the contention that there has been repeal of section 6 of Article X by implication, reference is made to the legislative declaration in section 1 of an Act passed contemporaneously with the one under consideration, designated as Committee Substitute for House Bill No. 63, wherein it is asserted, in effect, that the paying by the State of service charges on local school and road bonds is the only method available for the solution of the difficult tax situation now confronting the people of the State. While legislative declarations are, of course, entitled to the highest and most serious consideration, they are not conclusive.

In the case of *Lemon* v. *Rumsey,* 108 W. Va. 242, 150 S. E. 725, we held: "A legislative declaration of fact, if not arbitrary, is final." As illustrative of the sort of basis of fact which will justify the application of that principal, it is noted that in that case there was involved a legislative act which had for its purpose the control and eradication of a plant disease

commonly known as "apple rust" and which act declared any red cedar tree growing within a radius of three miles of any apple orchard to be a public nuisance. And, it must be further noted that, whereas in the *Lemon* case there was a legislative declaration of fact, there is presented here a legislative declaration of a matter primarily of a juristical nature. The ascertainment of a fact, as the basis of an enactment by the legislature, ordinarily will not thereafter be open for judicial determination. *Woodall* v. *Darst*, 71 W. Va. 350, 77 S. E. 264. But we are not familiar with any principle of law which gives like weight and dignity to a legislative declaration in respect of an existing condition as of fact but actually juristical. Indeed, differentiation is to be made between the different kinds of facts which a legislature may declare as basis of an enactment. The following case illustrates this point. In *Block* v. *Hirsh*, 41 Sup. Ct. Rep. 458, 16 A. L. R. 165, the statute therein considered permitted tenants in the District of Columbia to retain possession of property after expiration of leases and declared that "the provisions of title 2 are made necessary by emergencies growing out of the war, resulting in rental conditions * * * dangerous to the public health and * * * embarrassing to the Federal government in the transaction of the public business." The opinion, written by Mr. Justice Holmes, stated:

> "No doubt it is true that a legislative declaration of facts that are material only as the ground for enacting a rule of law, for instance, that a certain use is a public one, may not be held conclusive by the courts. * * * But a declaration by a legislature concerning public conditions that, by necessity and duty, it must know, is entitled at least to great respect. In this instance Congress stated a publicly notorious and almost world-wide fact. That the emergency declared by the statute did exist must be assumed * * *."

The Act in suit does not recite the existence of any factual or physical conditions which create an impasse to legislation which will relieve the embarrassing condition of the state's tax structure. The difficulties arise in the application of constitutional principles. Both the legislature and the courts have their responsibilities in the premises.

524

By legislative enactment, chapter 40, Acts First Extraordinary Session 1933, the state has taken charge of the county and district roads of the state. By another enactment, chapter 8, Acts First Extraordinary Session 1933, the schools of the state, including those of independent school districts, have been incorporated into a county unit system under the supervision and in large measure the control of the state. These facts are urged in justification of the state's assuming the bonded indebtedness of various units of the state for roads and schools. In answer to this argument it need only be emphasized that legislative enactments do not obliterate constitutional inhibitions. The taking charge by the state of the supervision and maintenance of the county-district roads must be considered as an entirely different proposition from assuming the local debts that were incurred in constructing them. Nor is it evident that the establishing of the county unit system for schools impairs the moral or legal obligation of the people who created the local school debts to discharge them, or creates by implication any obligation on the state to assume the burden of such debts. It is to be remembered, too, that the state has not taken the county-district roads away from the communities which built them; that, of course, would be physically impossible. What the state has done is to assume the burden of their maintenance. The school houses, also, whether paid for from the proceeds of bonds or not, remain permanently for the use of the communities which brought them into being.

The Act in question (Committee Substitute for House Bill No. 64) after appropriating out of the state treasury for the fiscal years ending June 30, 1934, and June 30, 1935, from taxes to be derived from incomes "so much moneys as may be required to meet all interest and sinking fund charges due and to become due during the said years" upon local bonded indebtedness (except municipalities) for roads and schools, carries a provision disclaiming that it is the purpose of the act to relieve the local units of such debts. However much or little this saving clause may amount to, the bold fact appears from the Act itself, that, at least to the extent of the appropriation sought to be made by the Act, the legislature is proposing to have the state assume or become responsible for the debts of local units. This is the very thing which the

Constitution says may not be done. If we are to have constitutional government, we cannot by circumvention or indirection avoid the meaning of plain words in our organic law.

While Article XII, section 1, of the State Constitution, requires the legislature to provide for a thorough and efficient system of free schools, section 5 of the same article designates the sources of revenue for the support thereof. The latter section reads:

> ''The Legislature shall provide for the support of free schools by appropriating thereto the interest of the invested 'School Fund,' the net proceeds of all forfeitures and fines accruing to this State under the laws thereof; the State capitation tax, and by general taxation of persons and property or otherwise. It shall also provide for raising in each county or district, by the authority of the people thereof, such a proportion of the amount required for the support of free schools therein as shall be prescribed by general laws.''

It thus appears that the support of public schools was made to partake of a dual character, with discretion vested in the legislature as to an equitable application of state funds.

Pursuant to permissive legislation, local taxing school units incurred bonded indebtedness which was in each instance, *ab initio,* the debt of the particular unit incurring it. These debts made possible the construction of valuable improvements for the special benefit of the respective communities themselves. In reason and fairness, the communities which incurred the debts should pay them. No other community had any voice in contracting the debts and should not therefore be required to help pay them. Since the formation of the state, it has been the constitutional concept that a community should not be permitted to incur indebtedness for its special benefit and then be relieved of its solemn, self-imposed obligation through paternalism.

As a practical matter, state funds have been used to supplement the support afforded by local school units, and under the Constitution such supplementation may now be increased by the legislature on such equitable basis of distribution as it may deem proper. The legislature has wide discretion with reference to the public school system but it may not con-

stitutionally cast upon the state the burden of school bonds contracted by local units. Although, in the first instance, the legislature could have placed on the state the major burden of support of elementary and high schools, it did not do so. And, upon the local units rested the entire burden of acquisition of school properties. The present bonded indebtedness is a creature of that responsibility.

We are also of opinion that the plaintiff's position that the act in question is in violation of the due process clause of section 1 of the Fourteenth Amendment of the Constitution of the United States is well taken. The purpose of that clause is to protect the individual from the arbitrary exercise of governmental power. *Bank of Columbia* v. *Okely,* 4 Wheat. 235, 244; *Dent* v. *West Virginia,* 129 U. S. 114, 124; *Twining* v. *New Jersey,* 211 U. S. 78, 101; *Scott* v. *McNeal,* 154 U. S. 34, 45. The same high authority has also laid down this basic principle in respect of the sovereign right of taxation: ''The power of taxation, indispensable to the existence of every civilized government, is exercised upon the assumption of an equivalent rendered to the taxpayer in the protection of his person and property, in adding to the value of such property, or in the creation and maintenance of public conveniences in which he shares, such, for instance, as roads, bridges, sidewalks, pavements, and schools for the education of his children. If the taxing power be in no position to render these services, or otherwise to benefit the person or property taxed, and such property be wholly within the taxing power of another state, to which it may be said to owe an allegiance and to which it looks for protection, the taxation of such property within the domicil of the owner partakes rather of the nature of an extortion than a tax, and has been repeatedly held by this court to be beyond the power of the legislature and a taking of property without due process of law.'' *Union Transit Co.* v. *Kentucky,* 199 U. S. 194, 202. Among other cases holding that a state may not tax property beyond its bounds are the following: *Looney* v. *Crane Co.,* 245 U. S. 178; *International Paper Co.* v. *Massachusetts,* 246 U. S. 135. Under these same principles, a municipality may not impose taxes for its own benefit upon property beyond its boundaries. *Wells* v. *City of Weston,* (Mo.) 66 Am. Dec. 627. Nor may

the bounds of a municipality be unwarrantedly extended for the purpose of bringing in farm property to subject it to taxation for the benefit of the municipality. *Morford* v. *Unger,* 8 Iowa 82. In that case, the court said that if a tax "be imposed for the benefit of others, or for purposes in which those objecting have no interest, and are, therefore, not bound to contribute, it is no matter in what form the power is exercised —whether in the unequal levy of the tax, or in the regulation of the boundaries of the local government, which results in subjecting the party unjustly to local taxes, it must be regarded as coming within the prohibition of the constitution designed to protect private rights against aggression, however made, and whether under the color of recognized power or not." In conformity with these principles, the Supreme Court of Virginia in the case of *Robinson* v. *City of Norfolk,* 108 Va. 14, 60 S. E. 762, held invalid a statute which authorized municipalities to levy license taxes on circuses exhibiting within one mile of municipal boundaries. In the opinion the court said: "To tax occupations outside of a city for the benefit of those living in a city is, in effect, taking the property of a citizen for private use; that is, for the use of a particular community, of which the outside citizen forms no part. Whether it be called a tax or the appropriation of property, the result is precisely the same. Power to violate those rights would seem to be quite beyond the lawful authority of any government, and certainly the legislative department of the government cannot arbitrarily take the property of one citizen to give it to another, and, of course, cannot authorize others to do so." Of course, a tax for a private purpose, as distinguished from a public one, violates the due process clause. *Loan Association* v. *Topeka,* 20 Wallace 655 (87 U. S.).

Concededly, in this jurisdiction revenue collected by the state, whether under direct property tax or otherwise, may be used by the state for state purposes, including support of free schools. Constitution of West Virginia, Art. X, sec. 5. But the using of state funds to pay local debts, as contemplated by the act in question, would place upon the plaintiff the burden of paying debts in the contracting whereof he had no voice, and from which he derives no benefit. As demon-

strated by the cases above cited, this is a taking of private property without due process of law.

By the same measure the act is violative of the due process clause of the Constitution of West Virginia, Art. III, sec. 10.

These are difficult days but they are not so difficult that organic law must be disregarded, or circumvented by forced constructions. The underlying purpose of written constitutions is that there may be a safe and definite harbor for the ship of state in times of tempest. Great tribulations of government do not arise in periods of administrative calm. They manifest themselves when the clouds are heavy. It is then that a constitution proves its worth in preserving for the people those fundamental principles of free government which are indispensable to the well-being of our democratic institutions.

If organic law be subverted through expediency, the basic guaranties of liberty are thereby imperiled. This truth is recognized and stated in our Constitution itself in dignified and forceful phraseology:

"The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism." Sec. 3, Art. I, Const. W. Va.

In the light of all that is above written, we reverse the decree of the trial chancellor, overrule the demurrer to the bill and remand the cause for further proceedings not at variance with the principles stated in this opinion.

*Reversed and remanded.*

KENNA, JUDGE, concurring:

As I understand the history of the litigation in this court directly concerning the Tax Limitation Amendment, we have decided the following propositions:

In the case of *Finlayson* v. *City of Shinnston et al.*, 113 W. Va. 434, 168 S. E. 479, we held that the sinking fund and interest for bonded indebtedness, both future and past, could not be laid regardless of the limitations intended by the constitutional amendment. It is worthy of note in connection

with the decision of that case, by a unanimous court, that at the time the opinion was handed down no enabling act had been passed by the legislature and that, therefore, the only thing involved in the case was the question whether debt service could be levied for regardless of all limitations, both constitutional and legislative. The question was not one of exceeding limitations, but one of disregarding them *in toto*.

In *Herold et al.* v. *Townsend, Tax Commissioner*, 113 W. Va. 319, 169 S. E. 74, we held that the procedure and election for the adoption of the tax amendment contained no such irregularities as would vitiate it. In doing this, the court took the view that the theory of liberal construction was more consonant with our institutions in such matters than was the rule of strict construction.

Then came the cases of *Bee* v. *Huntington* and *Eakle* v. *Braxton County Court*, 114 W. Va. 40, 171 S. E. 539, which involved an act of the legislature placing it within the power of the local levying units to exhaust the entire legislative limitations of the enabling act for their current expenses, and thereafter to super-impose the total of their debt service requirements in the field of excess levies. In these cases, we held that the plan set up in the act was in conflict with the purpose of the tax amendment to limit levies for current expenses, and was therefore invalid. The principle laid down in this case that levies for debt service are to be laid before levies for current expenses is, in my opinion, to be restricted in its application to the levies for each individual unit. It is not to be applied to the sum total of overlapping levies for all units, for in that case, the debt service levies of one collide with the debt service and current expense levies of another.

The case now before us involves the sheer question of whether the State of West Virginia by act of the legislature may undertake for a biennium, to pay the sinking fund and interest of local debts. In my opinion, to do this violates the constitution, which states in express terms that the state shall not assume nor become responsible for the debts of counties, cities, townships, corporations and persons. (Const., Art. X, sec. 6.) I cannot subscribe to the thought that payment of debt is not becoming responsible for debt *pro tanto* the payment. Neither can I subscribe to the theory that such assump-

tion is indispensable in order to render the tax amendment workable as the last expression of the will of the people contained in the constitution, which must be given effect even though some previously written portion of that instrument must be disregarded in order to do so.

Conceding that the tax amendment must be given effect notwithstanding previously written parts of the constitution which might, to a degree or perhaps wholly, prohibit some of the things necessary to be done to give that amendment workable application, we are still confronted by the fact that if, on any possible theory, the tax amendment can be made effective and workable without violating any of the previously written parts of the constitution, this course should be taken as a solution rather than to disregard any part of the fundamental law. In other words, the rule of construction *ex necessitate* cannot be invoked in the face of a practical solution of the difficulty, consistent with the true purpose of the tax amendment and also consistent with other portions of the constitution. This statement is made with the fact in mind that the tax amendment must be given effect according to its true purpose. Being the last expression of the people's will, contained in the constitution, its true purpose cannot give way to other portions of that instrument written before the tax amendment.

It, therefore, seems to me that refusing to adopt the *ex necessitate* rule of construction requires a statement of some practical solution of the difficulty to justify it. In other words, if there is no practical solution of the difficulty other than the overriding in whole or in part of a previously written part of the constitution, then the rule requires that that be done as a matter of necessity. Refusing to adopt the rule of necessity can be justified only in the event that some other solution seems available. Therefore, I am impelled to discuss what I regard as some sound legal principles that will contribute to a substantial solution of the difficulty of applying the tax amendment. These principles, in my opinion, are legally sound and must be encountered and met at some point in any conceivable solution.

What seems to me to be an error exists in both of the acts of the legislature that have been before us. I refer to the

fact that in both acts a single allotment or allocation of the power to lay property levies has been made to the county courts and the road districts as one single unit. They should be separately treated. Otherwise, out of the levy allotted to the county courts by the legislative enabling act, the county court is required to provide for the payment of sinking fund and interest on district road bonds. Since, under the *Bee* case, levies for sinking fund and interest (debt service) are to be laid before levies for current expenses, uniting counties and road districts as a single unit means that debt service for district roads must be provided out of the county levy before levies for current expenses of the county can be considered. Therefore, in laying the levy, the highest levy required by any magisterial district in the county for debt service on district roads must be subtracted from the county levy, and for its current expenses the county can lay only what remains. If it has a debt service requirement of its own, this, too, must be provided for before it can lay its levies for current expense. Should the debt service requirements of the county conflict with those of the road district, there is no rule to settle the conflict. Hence, if a single road district within the county *should require the entire county levy* for its debt service purposes, the county, because it must, for county purposes, lay a uniform levy throughout the county which cannot be greater in one magisterial district than in another, is thereby deprived of the right to lay *any levy* throughout the entire county for county current expenses, even if the other magisterial districts of the county have no road bonded indebtedness to provide for. Carrying the illustration further, if, in a county having seven road districts, magisterial district ''A'' requires ninety per cent of the total county levy in order to provide debt service for its district road bonds, then in magisterial district ''A'', the remaining ten per cent of the county levy is all that the county can lay for its current county expenses. Ten per cent being all that the county can lay in magisterial district ''A'' for current expenses, it follows that in order to make the county levy uniform throughout the county, ten per cent is all that may be laid for county current expenses in magisterial districts ''B'', ''C'', ''D'', ''E'', ''F'' and and ''G'', even though those magisterial districts require no

levy for debt service. It follows that the county has lost ninety per cent of its levying power in magisterial districts "B", "C", "D", "E", "F" and "G" because of the bonded indebtedness of magisterial district "A". This great loss of levying power is the thing that has crippled the counties under the plan set up in the legislation that was before us in the *Bee* case and does the same thing in the legislation before us in this case. The remedy, it seems to me, is simple and is based upon sound legal principles.

The levies for sinking fund and interest of district road bonds are not levies for county purposes. They have never been. It is true that the county court acts as the fiscal governmental agent for magisterial districts when laying their levies for district road debt purposes and in collecting and disbursing the money derived therefrom. In this respect, however, the counties, as to the districts, are the mere machinery for carrying out what has been done in the magisterial districts by a vote of the people therein when imposing an obligation upon themselves. See Code, 13-1-1, *et seq.* The obligation is co-extensive with the district, as are the levies to be laid to meet it. This is illustrated by the holding of this court in the case of *State ex rel. White, Tax Commissioner* v. *County Court,* 63 W. Va. 230, 59 S. E. 884, point one of the *syllabi* of which case reads as follows:

> "The clause in section 29 of chapter 39 of the Code, as amended by chapter 63 of the Acts of the Legislature of 1907, saying, 'The said county court shall thereupon levy so many cents on every hundred dollars of the valuation of the property taxable in the county according to the last assessment thereof, as will cover the estimated amount necessary to be raised for county purposes and as aforesaid approved during the fiscal year; but such levy shall in no case exceed thirty-five cents on the one hundred dollars valuation of property,' does not limit the powers of the county courts respecting the amounts to be raised by taxation for district road purposes."

I realize that it has been said that magisterial districts, as such, have no debt creating powers. But it cannot be said that such districts, by popular vote, cannot incur the obliga-

tion to submit the property of the district to a tax to meet a debt for money spent in the district for district purposes. Mandamus would lie to compel a district debt levy for such purpose, not a county levy. The county court may be bound by the debt, but the district is bound to submit to the levies for its payment.

It follows that the road district, for the purposes of the tax amendment, should be treated as a separate levying unit for the purpose of providing its debt service and should be given separate and distinct allocations in any legislative enactment that may be set up under the tax amendment. Then the district road debt problem is separated from the county problem and stands where it logically belongs, to be solved within the district that voted the bonds and without interference with the right of any other levying unit to lay levies. If the right to lay a separate levy under its own limitation prescribed by the enabling act, is given to the county court for the district for road purposes (not confusing it with the district for school purposes, which must be preserved for debt service as a levying unit unto itself), then when a given magisterial district must exceed the legislative limitation placed upon it in order to provide debt service for its district road bonds, the amount of the excess levy does not absorb any of the levying power of any other taxing unit. The excess levy is laid because it is necessary to do so in order to prevent the impairment of the obligation of a contract. Being outside the limitation, and legitimately so, prescribed for the levying unit, the excess absorbs no part of the constitutional limitation that has been assigned by the legislature to other levying units to lay for other governmental purposes co-extensive with their respective territorial limits. Providing for the debt service of one taxing unit cannot be permitted to interfere with the governmental functions of a separate and distinct taxing unit.

The last statement involves another principle that seems to me to be inherent in the tax amendment itself and inevitable to its correct understanding and proper application. That principle is that the constitutional limitations are limitations upon the legislature only, and restrict only the right of the legislature to confer levying power and to authorize levies to

be laid upon property by the various taxing units throughout the state. It did not require a constitutional amendment to give the legislature power to limit local levying units. It had that power. It did require a constitutional amendment to limit the legislature itself. The aggregate of all of the taxes to be assessed in any one year means the aggregate of all the taxes authorized to be assessed in any one year, and the term ''all the taxes'' necessarily gives way when the impairment of the obligation of a contract steps in and requires levies to be laid for debt service in excess of those authorized. In allocating the levies to the taxing units in an enabling act, the legislature is restricted by the constitutional amendment and can allocate only to the extent of the limitations therein prescribed. These levies are the authorized levies. The excess levies may be authorized in the sense that the method of arriving at them is prescribed, but *this is not to authorize them to be laid*. Contractual obligation requires and alone justifies that to be done. Levies not expressly authorized by statutory law may, however, be laid when pre-existing contractual indebtedness requires that this be done. When the legislature has authorized the taxing unit, through the medium of its enabling act, to lay levies within the constitutional limitations, then those levying bodies are limited by the enabling act. They are authorized to lay the levies prescribed by it and no more. Consequently, it is the legislative limitation that circumscribes the levying unit. Its power is limited by the act of the legislature and not directly by the constitution. The unit cannot, in laying its levy, reach the constitutional figure without first exceeding the limitation placed upon it by the legislature. The only purpose for which it may exceed the limitation placed upon it by the legislature is to take care of its pre-existing debt. When, for that purpose, it must exceed its legislative limitation, it then is in the field of excess levies in so far as its levy goes above the legislative limitation placed upon it. For the excess it is not encroaching upon the levying power of any other taxing unit that has been conferred upon that unit by express act of the legislature. To say that after the legislature has allocated the right to levy within the constitutional limitation binding upon it, that the taxing units are severally bound by their legislative

limitations and, furthermore, that they are bound in the aggregate not to exceed the constitutional limitations, is to set up a system of double limitations, inconsistent, each with the other, while a system of single limitation is all that is contemplated. Limitations are essentially single. When it is attempted to set up a system of limitations within limitations, orderly method is lost in a maze of logical conflict. The thing does not admit of double standing.

So, in my humble opinion, the constitutional limitations apply directly to and bind the legislature alone. The levying units throughout the state are bound directly only by the legislative limitations prescribed in the enabling act. They are bound by lesser limitations than those contained in the constitution. Being so limited once, it is useless to say that they are again limited by higher figures.

I see no reason logically why the same principles that I have attempted to apply to road districts, which I think are clear and unanswerable, should not now with equal force be applied to school districts. The school districts contracted their debt with resources pledged to the payment thereof coextensive territorially with the districts themselves. The people of the districts by popular vote and through their duly elected representatives placed themselves with respect to this indebtedness in the position they now occupy. From a legal standpoint, it seems, therefore, entirely logical that for the purpose of discharging this indebtedness the legal existence of school districts must be preserved. If this be done, then it follows that levying power must be allocated by the legislature to the school districts on a district basis for the purpose of providing their debt service requirements for pre-existing debt. To expect a *county* school unit to provide from its levy for school *district* debt service is to confront again a wasted levying power in order to preserve uniformity of levies as was seen in the case of district roads. The county school unit, erected by an independent enactment and for an entirely independent and separate public purpose, is to administer the schools henceforth as a totally different unit of government from the former school districts. The county unit is to be the instrumentality by which school affairs are operated and administered for the future. It is, therefore, neces-

sary that the county unit should be given levying power for the current expenses of the schools. If the old school districts are to have a legal existence for the purpose of discharging their legally contracted pre-existing debt, and the county unit is to have its existence, unrelated to this debt but for the purpose of operating the schools from now on, it seems entirely logical and in consonance with legal principles that the old school districts should be given a levying power for debt service requirements, and that, as a separate and distinct proposition, the county boards of education should be given a levying power for the purpose of meeting the operating expenses of the schools. They would not then infringe upon one another and the school debt would be provided for on the same basis that has been suggested for district road indebtedness.

These two principles, it seems to me, would tremendously relieve the pressure of lost levying power that otherwise is brought about in order to preserve uniformity of levies.

Having relieved the situation thus far, we come to the proposition that perhaps some counties or other taxing units require still further relief. This can to a large degree be provided. for, in my opinion, by the state taking over any part but not all of the operating expenses of the schools, and, to the extent that it does so, dispensing with the necessity of the county boards of education laying property levies for the schools. To the extent that the state does take over and provide money for the operating expenses of the schools, the legislature may give to other taxing units, as and where required, the levying power of which the county boards of education are relieved. This is a broad field. Approximately fifteen million dollars has heretofore been raised by direct levies to provide operating expenses of the schools. Inasmuch as the constitution of West Virginia makes the free school system a primary responsibility of the state and expressly enjoins upon the legislature the duty to provide for that system, to my mind, it is entirely clear that the state may furnish any part of the operating expenses of the state's free schools. Therefore, the state may go to the relief of the situation directly as to the schools, and thereby indirectly as to the other levying units, to the extent that it wishes to provide funds for the operating expenses of schools.

It may be said that after the impounded levying powers have been released by measurably solving the question of uniformity through applying the principles suggested, and after the levying powers of other taxing units have been augmented to the extent that the state sees fit to take over the operating expenses of schools, that still some taxing units of the state would be unable to provide themselves with operating revenue. Upon such data as I have been able to examine it would seem that the taxing units that are still in distress for a means of providing their operating revenue after the things suggested have been done, are taxing units whose fiscal affairs in the main are in total and irrevocable confusion. It appears that some of them, at least, are in this position by reason of indebtedness irregularly contracted. It does not seem unavoidable that these taxing units should be made the standard by which a solution of the questions of applying the tax amendment for the whole state should be arrived at. However, for the sake of argument, conceding that local government in these taxing units cannot be permitted to be jeopardized even on account of a hopeless debt situation brought about by themselves, or on account of failing to solve their problem by legislation putting the tax amendment into effect, we have still the provision of the tax amendment to the effect that the limitations erected thereunder in any taxing unit may be extended fifty per cent by the vote of the people of the unit. This provision has been generally disregarded in the discussion of legislation under the tax amendment. It has been so disregarded because it is conceived to be impracticable, under the circumstances, to procure the required sixty per cent of the registered voters of the unit in favor of an extension of the limitations, even to prevent a breakdown of their own local government. To my mind, this court cannot disregard an express provision of the tax amendment obviously put there to meet governmental emergencies, because it or others may consider the provision impractical. It was put there for a practical purpose. We must presume that the legislature in writing and the people in adopting the tax amendment believed this provision would serve the purpose for which it was intended. For the court to disregard this provision as

impractical is to ignore the very means provided to meet the emergencies that the tax amendment would bring about, and to strain the constitution in order to provide the people of the unit with something that they will not provide for themselves. It is a sad commentary on local government to say that the people of a unit would vote to deprive themselves of it. So that at rock bottom, all things else having failed to give the required relief, the people of the governmental unit may provide fifty per cent more revenue, or any part of that amount, by extending the limitations in that particular unit, and may specify that that revenue be used for any purpose that they wish. If the extension is submitted to popular vote, under appropriate legislation, with the purpose for which the revenue will be expended expressly stated, then in my humble judgment that revenue can be expended only for the purpose so specified. It is quite clear, to my mind, that as long as this provision remains in the tax amendment and cannot be disregarded by the courts, we do not reach the question of sheer and absolute necessity until it has been invoked. The legislature may set up provisions by which this may be very quickly done in any of the taxing units of the state.

Supposing that all of the adjustments herein suggested should, as to some taxing units of the state, fail to work out a solution which would provide them with the bare essentials of local government. Without claiming exhaustive research that would enable me to state with certainty, it is my belief that the taxing units, if any, so situated would be relatively small in number. If this be true, then it could, with justice, still be said that a solution of the difficulties involved in applying the tax amendment suitably to the needs of the state at large had been arrived at, and that those few taxing units remaining in difficulty were so situated because of peculiarities existing in their own fiscal affairs. The seriousness of a breakdown in local government is not to be minimized. But I see no reason why, if a solution suitable to the needs of the overwhelming number of taxing units throughout the state can be arrived at, that that solution should be impeded because of a comparatively small number of taxing units requiring special treatment unnecessary throughout the state

at large.

I, of course, do not claim for what is here said that it will meet the situation to the minds of all. Neither do I mean to say that there may not be other and, perhaps, better ways to solve the problem. To my mind, the conclusion set forth is relatively satisfactory. It may be that a totally and absolutely satisfactory solution cannot be arrived at, at the moment, and by the instrumentality of one single piece of legislation. The matters herein set forth, in my opinion, run counter to none of the provisions of the constitution nor do they violate any decision of this court. If difficulties remain after we have progressed toward a solution, at least these difficulties have been and will be minimized as we go along. As the difficulties are narrowed, so is the solution focused.

HATCHER, JUDGE, dissenting:

This dissent is a protest against strict constitutional construction in the present tax emergency.

Article XII, section 1, of the Constitution commands the legislature to provide "a thorough and efficient system of free schools." In *Kuhn* v. *Board of Education,* 4 W. Va. 499, 509, the Court declared that this mandate confers on the legislature "plenary if not absolute power" to provide for the support of free schools. Schools cannot be maintained without school houses—the very houses in part for which school bonds have been issued. Section 5 of the above Article contemplates that "a proportion" of the costs of free schools shall be borne by the local taxing units. Fixing that proportion, however, is within fair legislative discretion. It seems to me that *a liberal* construction of Article XII would permit the legislature to provide that the state assume—as legitimate costs of maintaining schools—an equitable proportion at least of the current payments due on school bonds.

The Constitution prior to 1920 conferred on county courts the power *to establish and regulate roads.* See Article 8, section 24. That power was always treated as the exclusive power of county courts until the Roads Amendment of 1920 to the Constitution. That amendment conferred on the legislature the exclusive authority to establish and control a system of state roads and highways. Pursuant to that authority, the

legislature has finally included in the state system all the public roads including county and district roads which were built from the proceeds of bonds issued by the local units. I freely admit that a narrow construction of the Roads Amendment would yield no right to the state to assume the payment of any part of the local indebtedness for roads. But it seems to me that under liberal construction that right can be fairly implied as an incident to the power to take control of the roads. The majority opinion observes: "It would be no more unfair to require a man's neighbors to help pay his debts than to require numerous communities to help pay the debts of a particular one." Whatever application that observation may have to school indebtedness it does not apply to the roads situation. The communities which have constructed roads from the proceeds of bonds did so, unaided by other communities. Yet, under the scheme for having a state system of roads, taxes (gasoline, etc.) are collected from the bonded and the unbonded communities alike, and applied to the construction of roads in the unbonded communities. Thus the bonded communities (after having built their own roads unassisted) are helping build the roads in the unbonded communities. It was said in argument that the scheme profited the bonded communities because the state now maintained their roads. Maintenance alone does not place the bonded units on a par with the unbonded ones, as the latter get both *construction and maintenance* from the state while the former get *only maintenance. The scheme is badly out of balance.* Since the bonded units help in constructing the roads of the unbonded units, uniformity of treatment demands that the help be returned. This can be done—as the legislature proposes—by having the state assume the road bonds. The taxpayers in one county can and do under modern methods of transportation use the roads of other counties. So there are equities which countenance payment by the state as a whole for the construction of roads which all the citizens of the state may and do enjoy. Those equities should facilitate *liberal* construction.

This Court had before it in 1932 a case which involved the right of the state to advance funds for a local unit under the powers conferred by the Roads Amendment. I refer to *Road Commission* v. *County Court,* 112 W. Va. 98, 163 S. E. 815.

The facts there were different from the facts here, but the abstract principle involved in that case is identical with the one involved here. That case is referred to in the majority opinion herein, but I deem it of moment to supplement that reference. There, the state, through its road commission, had advanced money to pay for highway rights-of-way in Kanawha County. The county court was obligated under the law then existing to pay for the rights-of-way. The state in making the payments assumed (at least temporarily) the debts of the county. A point of demurrer to the declaration in that case was that such payments were in violation of Article X, section 6 of the Constitution. We then held on that point without equivocation: ''The language as well as the history of the section demonstrate that it has reference to state aid and state payments in matters of territorial interest to the county, and not to a situation like this where the advancement made the county by the state is essentially in the interests of the entire state.'' Pursuant to that holding, we wrote into the syllabus of the case: ''Strict adherence to the letter of a constitutional provision is not requisite in a case clearly without the intendment of the provision.'' The constitutional provision thus referred to was section 6 of Article X, and the case ''clearly without the intendment of the provision'' was the case where the state had assumed a local unit's indebtedness for roads. If strict adherence to Article X was not requisite then, *a fortiori* it is not requisite now.

This Court is committed to the rule that we should make even a strained effort (if necessary) to uphold a legislative enactment and that the negation of legislative power ''must be manifest beyond reasonable doubt'' before an act will be declared unconstitutional. *Leonhart* v. *Bd. of Ed.*, (W. Va.) 170 S. E. 418, 421. I point to the fact that the majority opinion does not marshall the substantial reasons which favor the bills in question or evidence any trace of effort to uphold them.

The foregoing has been written without reference to the effect of the Tax Limitation Amendment of 1932 to the Constitution. In House Bill No. 63 the legislature stated that in its judgment the plan proposed in that bill was ''the only solution of this problem consonant with the amendment to the

Constitution adopted November 8, 1932, and the decisions of the Supreme Court of Appeals thereon.'' I cannot treat that declaration in the cavalier manner adopted by the majority. The opinion points to no fact which would show the fallacy of the declaration, presents no solution itself, and is silent on the motives prompting the majority for giving the declaration no consideration. The opinion does say that the Act ''does not recite the existence of any factual or physical conditions which create an impasse to legislation which will relieve the embarrassing condition of the state's tax structure.'' The Act would have been more complete in itself if it had listed the facts confronting the legislature. But why demand a statement of facts from the legislature, when it is common knowledge in which we share that the bonded indebtedness of a number of districts and of some counties is so great that after first paying the debt services, there will be little and in some districts nothing left of the direct taxes for current governmental expenses. Why say to the legislature ''we would see a sign from thee''?

Prior to the recent amendments to the Constitution (Roads and Tax), the majority of the Court would have been more justified in its uncompromising regard for Article X of the Constitution. The later amendments have weakened the force of Article X in case of conflict with it. This is admitted theoretically in the majority opinion but is given no practical effect therein. The facts above referred to (of which we take judicial notice) demonstrate that there is conflict between the tax amendment and other constitutional provisions. Unless the amendment is to fail, the other provisions must yield to some extent. *The utmost liberality* in construction is therefore imperative; yet the most friendly commentator could hardly consider the majority construction as *liberal*. The opinion says that organic law must not be disregarded because *the days are difficult*. A lofty sentiment in which I heartily concur. I know of no effort in this case to have organic law disregarded. The *Tax Amendment is organic law* just the same as Article X and the effort under consideration is to make that Amendment operative. There is no contention that the plain and simple words of Article X have lost their meaning. But the words in the Tax Amendment are just as plain and

simple, and they also have not lost their meaning. The opinion also says that constitutional provisions should be harmonized. Again I concur, but the contemplation of the majority seems to have been restricted to Article X. Of a certainty the opinion is barren of effort to harmonize the Tax Amendment and Article X, or to show how they can be reconciled.

We as judges should not close our eyes to the difficult problem which the facts imposed upon the lawmakers. My attention has been called to no solution of that problem—and I presume the legislature knew of none—which does not seem to involve an infringement on some constitutional provision. We should recognize that the legislators had divergent views on the best solution of the problem; that they were confronted at every turn by constitutional inhibition and were at sea on what solution the Court would hold to be legal. The legislators were cognizant of the liberal judicial ruling on the Roads Amendment in *Road Commission* v. *County Court, supra,* and of the broad judicial construction given the Article on education in *Kuhn* v. *Bd. of Ed., supra.* The legislators had the right to expect continued judicial liberality on those two subjects. That expectation would account for the selection of road and school bonds as the subjects of state aid. It is not difficult to conceive that because of that expectation— and because of that alone—the legislators were able to reconcile their different ideas of how to make the Tax Amendment workable. Therefore I take the legislative declaration of "only solution" to mean that House Bills 63 and 64 are the only ones upon which the legislators could agree. If I am correct, the declaration is one of fact and not a "juristical" pronouncement as the majority opinion terms it. The Constitution, Article V., section 1, provides that the Legislative and Judicial Departments "shall be separate and distinct" and that neither "shall exercise the powers belonging" to the other. It is assuredly the exclusive power of the legislature to determine the temper of its own members. This Court said in *Slack* v. *Jacob,* 8 W. Va. 614: "The judiciary cannot inquire into the motives and necessities which may have super-induced the passage of an act." If the judiciary cannot even make that inquiry, what possible warrant has the majority for dis-

approving the legislative declaration of "only solution"? The practical effect of the majority finding is to say to the legislature: "You are mistaken, there is another solution." Even so, the majority cannot foresee that the legislators will divine whatever solution the majority has in mind and agree on that solution. Each legislator has the right to exercise his own judgment on the policy of a legislative measure without judicial coercion. I cannot escape the view that the deliberate declaration of the chosen representatives of the people is entitled to the utmost consideration, as presenting in fact a case of the *only legislative solution* of the tax problem.

Under the majority opinion each local unit must continue to pay its own bonded indebtedness. The inevitable result of such payments will be that the legislature will have to arrange, in some manner, to furnish current governmental expenses to those units which exhaust all direct taxes on debt services. Personally I see no serious legal objection to that expedient. In that event, however, will not section 6 of Article X have to be violated *pro tanto?* If so, will the majority soften its present construction of that section?

The majority decision in its present form cannot serve but to increase the perplexity of the legislators. The rock of its enactments crumbling—the legislature is cast back into the whirlpool (with apologies to Robert S. Spilman, Esquire). The ordinary purpose of the judicial opinion is to clarify the legal situation. I recognize that courts should never in opinions such as this attempt to sway legislative deliberations. But the state cannot endure indefinitely this Departmental battledore and shuttlecock. Because of the present emergency, I submit that the majority would be well within the bounds of judicial propriety, were it to indicate (if only in a general manner) some avenues which the legislature might travel without encountering impassable constitutional barriers.

If it is necessary for the state to assume the payment of all the current charges due on local school bonds in order to make the Tax Amendment workable, I would say the state had that right. I disapprove the majority opinion for not giving consideration to the question of that necessity. I hold to the view that the state may lawfully assume the payment of the current charges on local road bonds. Consequently I dissent.

On rehearing, my attention has been called to the following decisions:

(a) *Carlton* v. *Mathews,* 103 Fla. 302, 137 So. 815, in which it was held that it was no violation of provisions in the Constitution of Florida, similar to our own, for the state to reimburse counties for expenditures on roads subsequently taken over by the state. The court sanctioned the plan, according to its express language, "upon moral and equitable considerations and as obligations of justice and honor, as distinguished from legal contractual obligations. The power to ascertain and determine the obligations within this class being entirely political and legislative. *United States* v. *Realty Co.,* 163 U. S. 427; *Guthrie National Bank* v. *City of Guthrie,* 173 U. S. 528; *Knights* v. *Jackson,* 260 U. S. 12; *Mitchell* v. *Lowden,* (Ill.) 123 N. E. 566." (page 348 of 103 Fla., 137 So. 815, 835.)

(b) *Mitchell* v. *Lowden,* 288 Ill 327, 123 N. E. 566 (cited by the Florida court), which held that the state could repay the counties for their expenditures on roads subsequently taken by the state without violating constitutional provisions similar to ours. We are now in a court of equity and I submit that there is no material difference in effect between reimbursing a county which has paid such expenses and in paying the expenses (bonds) in the first instance.

(c) *Williams* v. *Parnell,* (Ark.) 51 S. W. (2d) 863, which held: "Statute authorizing state's issuance of state revenue bonds for refunding road improvement district bonds held not to violate constitutional provision prohibiting state from loaning its credit."

(d) *Baker* v. *Hickman Co.,* 164 Tenn. 294, 306, 47 S. W. (2d) 1090, in which the court held:

"The expenditures for which the counties are to be reimbursed were for a purpose in which the counties and the State had a common interest, and for which the State might have assumed the entire expense in the first instance. All of the roads, whether constructed by the counties or by the State, have been taken under the exclusive control of the State, to be maintained by state officers at state expense. In such circumstances, the changed legislative opinion being that the public welfare would be best served by

making the entire cost of the highway system a charge on the proceeds of a state tax, available for highway purposes, instead of dividing a portion of it among the counties, we think the appropriation of state revenue for such purpose is an appropriation for a state purpose, for which the power of state taxation may be constitutionally exercised.''

(e)   The Minnesota case (*Building & Loan Assn.* v. *Blaisdell*, 54 S. Ct. 231) decided by the Supreme Court of the United States on January 9th, in which the utmost liberality of constitutional construction was shown.

It will be remarked that the majority opinion gives no consideration to the foregoing decisions. The opinion is simply an apotheosis of section 6 of Article X. The foregoing decisions are late expressions of courts of last resort. We know of no late decisions to the contrary. Illiberality of construction finds no current support. Therefore Judge Woods and myself submit that our stand for liberal construction is judicially justified.

WOODS, PRESIDENT, dissenting:

The tax limitation amendment cannot be questioned on the ground that it conflicts with pre-existing provisions of the constitution; on the contrary, if there is a real inconsistency, the amendment must prevail because it is the latest expression of the will of the people. 6 R. C. L. 48. In such case there is no room for the application of the rule as to harmonizing inconsistent positions. And, under general principles of construction, effect should be given to every part and every word of the amendment, if possible, and, unless there is some clear reason to the contrary, no portion should be treated as superfluous. *Marbury* v. *Madison,* 1 Cranch. 137.

The next to the last sentence in the amendment provides: ''The legislature shall have authority to tax privileges, franchises, and incomes of persons and corporations and to classify and graduate the tax on all incomes according to the amount thereof and to exempt from taxation, incomes below a minimum to be fixed from time to time, *and such revenues as may be derived from such tax may be appropriated as the legislature may provide.*''

It is apparent that the electorate in ratifying the amendment recognized that the taxes thereunder would be necessarily reduced from what had formerly obtained, and that under some circumstances the individual units of government would be unduly restricted. There was no intention to repudiate debts or to cease to provide for the functioning of an orderly system of government.

Constitutional provisions, like a statute, must be construed with reference to the object to be accomplished, and when the real purpose is apparent, the language must be construed so as to carry the purpose into effect; mere words yielding to intent. It is not to be presumed that the portion of the amendment which I have italicized was inserted without reason, or that a result was intended inconsistent with the judgment of men of common sense guided by reason.

I am of opinion that the constitutional amendment is plainly open to the construction sought to be imposed upon it by the legislature in the act (Committee Substitute for House Bill No. 64) before us. If the power exercised by the legislature in the enactment of a statute is legislative in character, the Court cannot inquire into the wisdom of the legislation, but can enforce only such limitations as the constitution imposes. All questions of public policy are, except as controlled by constitutional limitations, for the legislature.

The companion act (Committee Substitute for House Bill No. 63) declares, among other things: ''And the legislature finding that only by this method can adequate constitutional levies be made available for the different levying bodies for the state, this act, therefore, contemplates,'' etc. It is needless to state that a legislative declaration, though not necessarily controlling, is entitled to great weight. Every possible presumption of validity should be brought to the aid of the questioned statute and the presumption should prevail until the contrary is shown beyond a rational doubt. Such is unquestionably the law in all jurisdictions.

When the tax limitation amendment, in its entirety, is read in conjunction with section 6, Article X, of the Constitution, relied upon in the majority opinion, it is clear that the rigor of the words of the latter section are shorn of their original meaning. Such construction of the amendment goes no fur-

ther·than to sanction an appropriation for certain specific purposes of revenues derived from the taxes imposed by the legislature on privileges, franchises and incomes. Power to do this is expressly conferred by the limitation amendment, providing that the revenues from the sources mentioned may be appropriated in such manner as the legislature may provide. In fact this conclusion is warranted by the express language of this Court in *Bee* v. *City of Huntington,* 114 W. Va. 40, 171 S. E. 539, that: "The people may, under the amendment, vote an increase of fifty percent in direct levy, *and through their representatives in the legislature, augment the revenues by indirect taxation.*" If the statute successfully passes the test prescribed by the Constitution, it is valid, and is a law regardless of whether a few or many deem it a good or an unwise law. The only inquiry which the judicial department may lawfully make is whether the statute is valid or invalid.

While I am in full accord with the reasoning and conclusions set out in the dissent filed by Judge Hatcher, I submit the foregoing note as an added reason for upholding the constitutionality of the act in question.

NOTE BY JUDGE LITZ:

I do not share the opinion of my associate, Judge Kenna, that direct levies may be laid under the scheme he proposes in excess of the constitutional limitation without violating its terms as interpreted by the rulings in the *Finlayson* and *Bee* cases. The error in the proposal (aside from those decisions) results from the assumption that the limitation applies only to legislative action. The argument from this premise seems to be that as the levies to meet the debts may be laid in the absence of an enabling act, the amendment is not violated by the legislature authorizing levies for other purposes to the extent of the limitation. The limitation is not confined to legislative sanction, but inhibits direct levies by fiscal bodies in excess of the respective aggregates enumerated in the classifications of property for taxation. It was so held in the *Finlayson* and *Bee* cases. The latter case expressly decides that only such levies as may be left within the limitation after providing for the current requirements of debts may be

allocated to current expenses of government. The plan: proposed by Judge Kenna, in my opinion, is but a repetition of the device contained in House Bill 314, considered in the *Bee* case. The only difference in the two plans is that House Bill 314 permitted the use of all levies within the limitation for current costs of government while the present proposal would allocate only a part of the levies to that purpose before paying debts. An extension of levies under the limitation, by its express terms, must come from the people and not from the legislature or the courts.

Being of opinion that the rulings in the *Finlayson* and *Bee* cases should be strictly adhered to, I respectfully disapprove of the proposed plan.

Judges Hatcher and Woods concur in these views.