170 S.E.2d 783 (1969)
Granville H. LANCE et al.
v.
The BOARD OF EDUCATION OF COUNTY OF ROANE, etc., John W. Stone, et al., Members, and Mirrell Clark, Superintendent of Schools of Roane County, West Virginia.
No. 12809.
Supreme Court of Appeals of West Virginia.
Submitted May 7, 1969.
Decided July 8, 1969.
Dissenting Opinion July 31, 1969.
On Rehearing November 11, 1969.
Further Rehearing Denied December 2, 1969.
*784 Lively, Francis & Hereford, J. Henry Francis, Jr., Charleston, McClintic, James, Wise & Robinson, Charles C. Wise, Jr., Charleston, for appellants.
Jackson, Kelly, Holt & O'Farrell, William T. O'Farrell, Charleston, George M. Scott, Spencer, for intervenors as parties defendant.
CALHOUN, Judge:
This case, on appeal from a final judgment of the Circuit Court of Roane County, involves two declaratory judgment actions instituted in that court pursuant to Article 13, Chapter 55, Code, 1931, as amended, and Rule 57 of the Rules of Civil Procedure, by Granville H. Lance, Fred Hill, Chester C. Dodd, Jr., Brady D. Hickel, Jr., and Joe A. Craddock, as plaintiffs, against the Board of Education of Roane County, a corporation, the individual members of that body and Mirrell Clark, Superintendent of Schools of Roane County, West Virginia, as defendants. Inasmuch as the two actions involve identical parties plaintiff, identical parties defendant, and similar or identical legal questions, they were consolidated in the trial court for hearing and for decision. In this Court, for the sake of brevity and clarity, the parties will be referred to as plaintiffs and as defendants in accordance with their designation in the civil actions in the trial court.
In one action, the plaintiffs challenge the validity of the three-fifths vote requirement of Article X, Section 8 of the Constitution of West Virginia and Sections 4 and 14 of Article 1, Chapter 13, Code, 1931, as amended, dealing with elections held by political subdivisions of the state for determination whether bond indebtedness shall be incurred. In the other action, the plaintiffs challenge the validity of the sixty percent vote requirement provided by Article X, Section 1 of the Constitution of West Virginia, commonly referred to as the Tax Limitation Amendment, relating to elections to authorize local tax levying bodies to make additional levies for tax purposes in excess of the *785 levies provided for in the Tax Limitation Amendment.
The plaintiffs contend that the constitutional and statutory provisions in question are invalid and unenforceable on the ground that they are in contravention of the Equal Protection Clause of the Fourteenth Amendment and the Guaranty Clause of Article IV, Section 4 of the Constitution of the United States.
By an order entered in the consolidated actions on November 22, 1968, the trial court sustained the defendants' motions for judgment on the pleadings made pursuant to Rule 12(c) of the Rules of Civil Procedure; held that the West Virginia constitutional and statutory provisions in question are constitutionally valid and enforceable; and directed that the complaints be dismissed and that the consolidated actions be stricken from the docket. From the final judgment of the trial court, the plaintiffs have been granted the appeal to this Court. After the appeal was granted, this Court granted to the plaintiffs leave to move to reverse the judgment of the trial court pursuant to Code, 1931, 58-5-25 and Rule IX of the Rules of this Court. In these circumstances, the case was submitted for decision by this Court upon the original record, upon typewritten briefs and upon oral argument of counsel.
The defendants, particularly the board of education, at a special election held on April 29, 1968, submitted to the voters of Roane County the question of issuing bonds in the amount of $1,830,000 for the purpose of alleviating the overcrowded condition of school classrooms and facilities, removing fire hazards, providing for more adequate and more modern vocational and educational facilities, and for the purpose of meeting the needs of disadvantaged children. At the same special election, there was submitted to the voters of the county a proposal for the laying of additional tax levies in excess of the regular authorized levies for a period of five years, a part of the proposed additional revenue to be used for current expenditures and a part for capital improvements. A canvass of the votes revealed that 2,887 or 51.55% of the total votes cast favored the issuance of the bonds and 2,866 or 51.51% of the total votes cast were in favor of the additional levy.
Subsequently the plaintiffs appeared before the board of education in their own behalf and in behalf of other persons who had voted with the majority on the two issues and demanded that the board authorize the laying of the additional tax levies and the issuance and sale of the proposed bonds on the ground that the sixty percent vote requirements in the constitution and the statutes were invalid in that they denied to the plaintiffs and others similarly situated the equal protection of the laws guaranteed to them by the Fourteenth Amendment and the republican form of government guaranteed to every state by Article IV, Section 4 of the Constitution of the United States.
Upon the refusal of the board to grant these requests or demands, the plaintiffs instituted the two declaratory judgment actions in the Circuit Court of Roane County by which they requested that the court declare the sixty percent vote requirements in question to be unconstitutional and void; and, by way of affirmative relief, the plaintiffs prayed in one action that the court require the board of education to proceed to authorize the issuance of the proposed bonds, to take all necessary steps in accordance with law to effectuate the sale of the bonds, and to provide for the application of the proceeds of the sale thereof, in accordance with the board's original proposal submitted to the voters at the special election; and similarly, in the other action, the plaintiffs prayed that the board of education be required to proceed according to law to impose the additional levy in accordance with the expressed will of the majority of the voters who voted upon that issue at the special election.
An answer was filed to the complaint in each of the two actions but, we believe, *786 they raise no material issue of fact. A decision of the case involves primarily the legal question whether the West Virginia constitutional and statutory provisions in question are in contravention of the Constitution of the United States and are therefore void and unenforceable; and also the question whether the case presents a justiciable controversy.
Article VI of the Constitution of the United States contains the following language: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Article I, Section 1 of the Constitution of West Virginia provides: "The State of West Virginia is, and shall remain, one of the United States of America. The Constitution of the United States of America, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land." By that clear and unambiguous language of the constitution of this state, it is expressly recognized that if there be an inconsistency or conflict between a provision of the constitution of this state and a provision of the Constitution of the United States, the latter must be regarded as paramount, must prevail, and the former must yield. In Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675, the Court held that a provision of the Constitution of the State of Texas was in conflict with the Equal Protection Clause of the Fourteenth Amendment and that the provision of the state constitution was therefore unconstitutional and invalid. Reynolds v. Sims, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506, 584, contains the following language: "When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls." See also State ex rel. Witt v. State Canvassing Board, 78 N.M. 682, 437 P.2d 143. We consider it unquestionable that if a provision of the Constitution of West Virginia is in conflict or inconsistent with one or more provisions of the Constitution of the United States, it is both the right and duty of this Court, when such a case is presented, to declare the provision of the state constitution to be invalid and unenforceable.
It is not questioned that the declaratory judgment actions were proper proceedings by which to require a judicial declaration of the rights of the parties in relation to the controversy in this case. This case presents an actual controversy and one which is justiciable within the intent and purpose of the declaratory judgment laws of this state. In a number of cases, this Court has held that the constitutionality of a legislative enactment may be determined in a civil action instituted pursuant to the statute and court rules of this state pertaining to declaratory judgments. Nuckols v. Athey, 149 W.Va. 40, pt. 2 syl., 138 S.E.2d 344.
In the present case, the plaintiffs assert that the effect of the sixty percent vote requirements in question is to debase or dilute the weight or force of an affirmative vote when considered in relation to the weight or force of a negative vote. More specifically, the plaintiffs contend that a negative vote has one and one-half the force of an affirmative vote and that, therefore, two negative votes have the force of three affirmative votes. Article 2, Section 4 of the Constitution of West Virginia provides: "Every citizen shall be entitled to equal representation in the government, * * *." In referring to and applying that constitutional provision, the Court made the following statement in State ex rel. Smith v. Gore, 150 W.Va. 71, 75, 143 S.E.2d 791, 794: "That constitutional provision is clear and unambiguous in its meaning. It provides that every citizen shall have equal representation in government." The provision *787 of our state constitution quoted immediately above is similar in its purpose to that of the Equal Protection provision of the Constitution of the United States. The West Virginia constitutional and statutory provisions for the holding of elections by which voters may determine whether bonds shall be issued and whether extra levies of taxes shall be made represent some of the very few instances in which the individual voter is permitted to have a direct and wholly effective voice in government. The two issues submitted to the will of the voters in the special election in Roane County involve the question whether taxes shall be collected to meet the extra levies and to retire the bonds. The voters were thereby also permitted to voice their sentiments and their views on the question of improved public schools and public school facilities for the county as a basic aspect of government.
As we have stated previously, the plaintiffs, speaking in behalf of themselves and all other voters who voted with the majority in the special election, assert that, by the debasement and dilution of their affirmative votes when considered in relation to the negative votes, they have been denied their rights under the Equal Protection provision of the Fourteenth Amendment of the Constitution of the United States. It is now clear, we believe, that such an assertion presents a justiciable question, cognizable by the courts, and not a mere political question.
Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, involved a declaratory judgment proceeding instituted in a United States District Court in Tennessee by certain voters qualified to vote for members of the General Assembly of Tennessee, in their own behalf and in behalf of other voters similarly situated, alleging that, by reason of a certain Tennessee statute, seats in the general assembly were arbitrarily and capriciously apportioned in such a manner as to dilute or debase the votes of the complaining voters, thereby denying to them their constitutional rights to equal protection of the laws under the Fourteenth Amendment. The Court held that the allegations of the denial of equal protection of the law, in the circumstances of the case, presented a justiciable cause of action upon which the complaining voters were entitled to a trial and a judicial decision. In the concluding portion of the opinion, the Court stated: "We conclude that the complaint's allegations of a denial of equal protection present a justiciable constitutional cause of action upon which appellants are entitled to a trial and a decision. The right asserted is within the reach of judicial protection under the Fourteenth Amendment." The decision of the Court in this respect has been adhered to and reaffirmed in subsequent cases including Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 and Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed. 2d 481. See also Armentrout v. Schooler, 409 S.W.2d 138 (Mo.1966).
In relation to the problems existing in Roane County in connection with the public school system, the plaintiffs have made the following allegations in their complaints:
"There have been no new schools or major additions or improvements to existing schools in Roane County since 1946 when the voters authorized the issuance of $5,000,000 bonds for such purpose. Since that time only minor improvements have been made to existing facilities, the outlays for such improvements averaging less than 4% of the annual budget for current expenditures. As a consequence the schools in the county have become old and inadequate for modern educational needs. There are an average of 31.2 pupils per elementary classroom and 25.5 pupils per secondary classroom in 1966-1967 compared with the state average of 28 pupils per elementary classroom and 23.6 pupils per secondary classroom. Many of the classrooms and other facilities are makeshift in nature resulting from efforts to adapt old facilities to existing needs. Dangerous conditions have been created by the *788 deterioration of many of the school structures. At least two major schools within the county, Spencer Elementary School and Spencer High School, have serious fire hazards which have resulted in orders from the State Fire Marshall and the State Superintendent of Schools closing certain parts of the facilities, prohibiting their further use until the conditions have been corrected and eliminated."
The plaintiffs further allege in their complaints that during the years 1964 to 1968, inclusive, six proposals of excess levies or bond issues for public school purposes have been submitted by the county board of education for approval of the voters of Roane County at elections held for that purpose and that in all instances the proposals received majorities of affirmative votes, which majorities ranged from 51.51% to 55.84%, but that in each instance the proposal was rejected because of a failure of the proposal to receive affirmative votes totaling at least sixty percent of the total number of votes cast. It is manifest, therefore, that there exists in this connection in Roane County a genuine controversy between the plaintiffs and the defendants and that it is a controversy of quite considerable magnitude and importance.
Pertinent cases which followed Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663, developed the "one person, one vote" concept. This concept was enunciated in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821. In the Gray case, the Court held that the Georgia county unit system was unconstitutional. The case involved a declaratory judgment proceeding instituted to determine the validity of the county unit system as a method of nominating candidates for statewide offices and for United States Senators in Democratic primary elections. The Gray case is strictly a "voting" case; it has nothing to do with reapportionment, redistricting, or the composition of State or federal legislatures. The Court held that the system impaired the right to vote of certain citizens and, therefore, denied those citizens the equal protection of the law guaranteed by the Fourteenth Amendment. In the Gray opinion the Court stated (372 U.S. at 380-381, 83 S.Ct. at 808-809):

"The only weighting of votes sanctioned by the Constitution concerns matters of representation, such as the allocation of Senators irrespective of population and the use of the electoral college in the choice of a President. * * *. But once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded.

* * * * * *

The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thingone person, one vote." (Italics supplied.)
The next case in point was Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed. 2d 481. This case involved the apportionment of congressional districts in Georgia. The appellants claimed debasement and dilution of their rights to vote because of the state's existing apportionment system and because of the failure of the state legislature to realign the state's congressional districts more nearly to equalize the population of each district. The Court held that an apportionment of congressional seats which "contracts the value of some votes and expands that of others" was unconstitutional. The Court, in applying the principles of the earlier Gray case, concluded that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." (376 U.S. at 8, 84 S.Ct. at 530).
With the Baker, Gray, and Wesberry cases as precedents, the Court, in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, considered the question whether the existing apportionment system of the Alabama State Legislature was valid *789 despite the fact that it was not apportioned on a population basis. The Court there held that there was a federal constitutional requirement that state legislatures be apportioned on a population basis.
The plaintiffs' position in this case is based upon the impairment of their rights to vote which are personal and individual rights. We believe that the following language from the Reynolds case (377 U.S. at 555, 84 S.Ct. at 1378) has a significant bearing on the legal questions raised in the present case: "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (Italics supplied.)
In a recent decision, Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583, announced June 16, 1969, the Court held a provision of the New York Education Law to be unconstitutional because it excluded from the electorate in school district elections certain voters who were otherwise eligible to vote in state and federal elections. The Court quoted with approval the following language from Harper v. Virginia Board of Elections, 383 U.S. 663, 655, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169: "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."
It is true that the "one person, one vote" principle has been applied by the Supreme Court of the United States primarily in reapportionment cases which involved the rights of voters to vote in elections for nomination or election of public officials. However, the "one person, one vote" principle has been stated in general terms and without qualification under the Equal Protection Clause. The application of that general principle has not, to our knowledge, been denied in any other area of voting in public elections.
Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647, announced June 16, 1969, dealt with a Louisiana statute, enacted pursuant to a provision of the constitution of that state. The statute authorized elections to be held by municipalities for the purpose of permitting the voters to vote on the question of the issuance of municipal bonds. The statute provided that bonds could be issued by a municipality only if approved by a majority in number and amount of "the property taxpayers qualified to vote". It was held in that case, in accordance with Kramer v. Union Free School District No. 15, supra, announced the same day, that the restriction of the right to vote to "the property taxpayers qualified to vote" violated the Equal Protection Clause of the Fourteenth Amendment and that, in this respect, the statute was unconstitutional and invalid. We deem this decision in point because it dealt with a local election and the rights of voters in an election dealing with the issuance of municipal bonds as distinguished from an election to nominate or elect public officials.
State ex rel. Witt v. State Canvassing Board, 78 N.M. 682, 437 P.2d 143, a 1968 case, involved the validity of a provision of the state constitution which required that any amendment of the constitution proposed by the legislature be ratified by "a vote of the people of this state in an election at which at least three-fourths of the electors voting in the whole state, and at least two-thirds of those voting in each county in the state, shall vote for such amendment." The proposed amendment which was submitted to the voters at the election in question received a percentage of 81.1851 favorable votes on a statewide basis. In one county, however, fewer than a majority of the voters favored the proposal and, in twelve counties, fewer than two-thirds of the voters approved it. As a consequence, a minority of the voters of the state who *790 resided in the thirteen counties in which the proposed amendment did not receive two-thirds approval prevailed over the expressed will of more than eighty-one percent of the voters on a statewide basis. That case is analogous to the present case in that it did not relate to the right to vote for representatives in government but rather to the right of the voter at an election involving an issue directly related to government. The Supreme Court of New Mexico, relying upon the "one person, one vote" principle, held that this legal principle, established pursuant to the Equal Protection Clause, could not in reason and logic be restricted to the mere right to vote for representatives in government, and declared to be invalid the constitutional requirement of a two-thirds favorable vote in each county of the state. Having done so, the court did not consider the validity of the requirement of a favorable vote by at least three-fourths of the persons voting on a statewide basis. That issue was moot for the reason that the proposal received more than eighty-one percent of favorable votes on a statewide basis. In that case the court stated (437 P.2d at 149):
"We see no escape from the conclusion that a requirement of a two-thirds favorable vote in every county, when there is a wide disparity in population among counties, must result in greatly disproportionate values to votes in the different counties. Where, as here, a vote in Harding County outweighs a hundred votes in Bernalillo County, the `one person, one vote' concept announced in Gray v. Sanders, supra, certainly is not met." (Italics supplied.)
It is asserted by counsel for the defendants that the Constitution of the United States contains many provisions which are repugnant to the idea of majority rule, including a provision that ratification of treaties requires a concurrence of two-thirds of the senators present and voting, requirements pertaining to amendment of the Constitution, and provisions relating to overriding a veto of a bill by the president. We consider this contention frivolous and wholly beside the point. First, it could not reasonably be contended that a provision contained in the Constitution is violative thereof. See Gray v. Sanders, 372 U.S. 368, 378, 83 S.Ct. 801, 9 L.Ed.2d 821. Second, we have concerned ourselves in this opinion only with the Equal Protection Clause which provides that no state shall "deny to any person" the equal protection of the laws. This constitutional provision imposes an inhibition upon each state for the protection of "any person" as an individual. It is an individual, personal right which is thus vouchsafed to "any person".
It is contended in behalf of the defendants that the Equal Protection Clause and the "one person, one vote" principle are not in point because this case merely involves the right of a state to require a sixty percent affirmative vote in elections which submit to the voters the issue of issuance of bonds or the issue of laying an excess levy for public school purposes. This, we believe, amounts to "arguing in circles" or an argument by circumlocution. It is a contention which begs the question. Its basis seems to be that this is an area in which the Equal Protection Clause cannot be binding upon the states. It is our view that we must first determine whether the sixty percent vote requirements violate the Equal Protection Clause and that, upon that basis, we must determine whether the state has the power to require the sixty percent affirmative vote.
We are of the opinion that the "one person, one vote" principle is now firmly established in broad general terms without qualification or exception. Certainly the right of the voter to equal protection, the right to protection against the dilution or debasement of the weight or force of an individual's vote, is fully as sound, sacred and important when he is voting on issues involving taxation, public revenue and the promotion of an adequate public school system, as when he is voting for the nomination or election of a constable, a *791 state senator, a governor or any other public official to represent the voter in government.
We are unwilling to concede that a determination of issues such as those involved in this case cannot be safely entrusted to a majority of the voters. There was no legal principle of which we are aware which required that the Constitution of West Virginia extend the right of the voter to express his will at the polls in the areas involved in the Roane County election in question in this case. The fact remains that our state constitution has extended the right of the voter into these areas; and when the voter was constitutionally granted the right to vote on these important issues, he thereby became guaranteed the equal protection of the law under the Fourteenth Amendment and the constitutional right to have his vote accorded the same weight, effect and force as that of any other persons's vote, and thereby he became protected by the constitutional right to have the weight, force and effect of his vote not debased or diluted when considered in relation to the vote of any other person.
If the right of a voter can be legally diluted or debased by the sixty percent requirement, it would seem to follow necessarily that it could be further diluted or debased legally by a seventy-five or a ninety percent requirement. In other words, if the weight and force of a person's vote can be debased and diluted in accordance with the contention of the defendants in this case, we see no escape from the conclusion that the weight and force of such a vote may legally be debased and diluted virtually to the point of total extinction.
For reasons stated in this opinion, we are of the opinion, and accordingly the Court holds, that the three-fifths vote requirement of Article X, Section 8 of the Constitution of West Virginia and Sections 4 and 14 of Article 1, Chapter 13, Code, 1931, as amended, and also the sixty percent requirement of Article X, Section 1 of the Constitution of West Virginia and Section 16 of Article 8, Chapter 11, Code, 1931, as amended, are in conflict with and violative of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States and that, therefore, such provisions are void and unenforceable. In these circumstances, it is unnecessary for us to decide whether the sixty percent vote requirements in question are violative of the Guaranty Clause of Article IV, Section 4, of the Constitution of the United States.
The motion of the plaintiffs to reverse the judgment of the Circuit Court of Roane County is granted, the judgment is therefore reversed and the case is remanded to that court for such further proceedings as may be proper and consistent with the decision of the Court embodied in this opinion.
Motion to reverse granted.
HAYMOND, President (dissenting):
I am amazed, shocked and deeply distressed at the unprecedented and constitutionally unauthorized decision of the majority of this Court in this proceeding by which it undertakes to invalidate certain statutory provisions and two provisions of Sections 1 and 8, Article X of the Constitution of this State. By my oath of office as a Judge of this Court, which I consider binding in conscience, I swore to support, not to invalidate, the Constitution of this State and, with all the sincerity at my command and upon grounds and for reasons to be stated in this dissent, I dissent from the decision of the majority. It should be clearly understood that in expressing my dissentient views, however, in this honest and sincere disagreement between my associates and me, my criticisms are directed, not to them, but to their decision.
With respect to the sanctity of an official oath to support a Constitution, the great Chief Justice, John Marshall, in the landmark case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, at page 178, 2 L.Ed. 60, used this language: "Why otherwise *792 does it [the United States Constitution] direct the judges to take an oath to support it? This oath certainly applies in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments and the knowing instruments, for violating what they swear to support!" Though these remarks were directed to the oath to support the Constitution of the United States they are applicable to an oath to support the Constitution of this State.
The Constitution of West Virginia is the fundamental, organic law of this State. It was made by the sovereign people of West Virginia and by them alone; and only the people of West Virginia, not this Court, can unmake that Constitution. It, and it alone, creates, maintains and preserves this State as a sovereign governmental entity and without it, intact and unimpaired in all its parts, this State can not exist or function as a sovereign governmental entity. All the departments and offices of the State Government of West Virginia, including its executive, its legislative and its judicial branches, are created by that Constitution and the power and the authority, in their entirety, which any of them possesses are derived solely from that Constitution and from no other source. That Constitution is equally binding on all the political subdivisions of the State and upon its courts, and every officer and every citizen within its territorial limits.
To say that this Court, the creature of the Constitution from which it derives all the power and the authority which it possesses, may invalidate that Constitution or any of its provisions, is incredible beyond my power of belief and any such utterance does not make sense to me.
That this Court is without authority to invalidate the Constitution of this State or any of its provisions is clear to me beyond question. Manifestly it derives no such power from the Constitution of this State or from any agency of the Federal Government. On the contrary, such power is denied it by express provisions of the Constitution. The people of this State, and they alone, possess that power to the exclusion of all governmental instrumentalities of the State.
Article IV, Section 5 of the Constitution of this State provides that every person elected or appointed to any office, before proceeding to exercise the authority or to discharge the duties of such office shall make oath or affirmation that he will support the Constitution of the United States and the Constitution of this State, and that he will faithfully discharge the duties of the office to the best of his skill and judgment. Under that provision any vote or act of any officer of this State, including all its judges, which operates to invalidate the Constitution or any of its provisions is ineffective and of no force or effect.
That no judge or other officer of this State can act as such in any manner to invalidate or nullify, change or amend any provision of the Constitution of this State is manifest by Sections 1 and 2, Article XIV of the Constitution by which the people reserve to themselves the exclusive right and power to alter or amend the Constitution and provide the manner in which any alteration or amendment shall be made. Those methods, which are exclusive, are ratification by a majority vote of the people of this State, at an election for the purpose, of acts or ordinances of a Constitutional Convention created in the manner provided by the Constitution and submitted to the people, and ratification by a majority vote of the people of this State, at an election for the purpose, of any amendment proposed by the Legislature. The action of the majority in undertaking to invalidate the constitutional provisions here under consideration is contrary to and violative of the constitutional provisions to which I have referred, and all such action is null and void and of no force or effect for that reason alone.
That this Court is without authority to invalidate any provision of the Constitution *793 of this State is also indicated by the historical record that no judge of this Court in any of the more than 13,000 cases that have been decided by it during the period of 106 years of its existence has ever voted or acted to invalidate any provision of the Constitution of this State; and until the present decision in this case none of the total number of fifty judges of this Court during its entire period of existence has ever engaged in or taken such action.
To the contrary, this Court in its prior decisions has uniformly held that this Court does not have the power to amend, alter or repeal any provision of the Constitution of this State and that the provisions of that Constitution are binding upon all departments of government of this State, all its citizens, and all persons whomsoever within its jurisdiction.
In the recent case of State ex rel. Smith v. Gore, 150 W.Va. 71, 143 S.E.2d 791, decided in 1965, an apportionment case, in which this Court unanimously and correctly held that representatives to a Constitutional Convention must be selected by voters on an equal population basis, the opinion written by Judge Caplan says: "A constitution is the fundamental law by which all people of the state are governed. It is the very genesis of government. Unlike ordinary legislation, a constitution is enacted by the people themselves in their sovereign capacity and is therefore the paramount law. This basic organic law can be altered or rewritten only in the manner provided for therein. Under the provisions of Article XIV of the West Virginia Constitution this can be accomplished by the legislature or by a convention. * * *. Each may formulate and present for a vote of the people proposed alterations of the constitution. In either case, until the people act such proposals have no force or effect of law."
In Re: Assessment of Shares of Stock of Kanawha Valley Bank, 144 W.Va. 346, 109 S.E.2d 649, the opinion prepared by Judge Browning, contains these pertinent statements: "This Court does not have the power to amend, alter, or repeal any provision of the Constitution of this State. That is a prerogative that the people have reserved unto themselves alone. It is within our power though, and our paramount duty, to prevent others from amending or repealing any part of the organic law of this State except in the manner provided in the document itself."
In Harbert v. County Court of Harrison County, 129 W.Va. 54, 39 S.E.2d 177, this Court, in a unanimous opinion written by me said "The Constitution of this State is the supreme law of West Virginia; it is subject only to the Constitution of the United States and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made, under the authority of the United States, all of which constitute the supreme law of the land. United States Constitution, Article VI, Clause 2. The Constitution of West Virginia is binding upon all the departments of government of this State, all its officers, all its agencies, all its citizens, and all persons whomsoever within its jurisdiction. The three branches of our government, the legislative, the executive, and the judiciary, alike derive their existence from it; and all of them must exercise their power and authority under the Constitution solely and strictly in accordance with the will of the sovereign, the people of West Virginia, as expressed in that basic law. It is the solemn duty of this Court, its creature, to obey and give full force and effect to all its terms and provisions."
The majority has evidently overlooked or purposely ignored the quotations in the three above cited cases for it does not overrule or even mention any of them in its opinion in this case.
In the early case of List v. City of Wheeling, 7 W.Va. 501, in which Section 8, Article X of the Constitution of this State, one of the provisions here under consideration, was recognized and considered, this Court, in the opinion delivered *794 by Alpheus F. Haymond, President, who was my grandfather and who had been a member of the Constitutional Convention of 1872, used this language: "The Constitution is the fundamental law of the state, in opposition to which any other law must be inoperative and void." Of course, in that case the constitutional provision now under attack was without question recognized and considered to be valid, and its validity has been recognized in many subsequent decisions of this Court. See Berry v. Fox, 114 W.Va. 513, 172 S.E. 896; Bee v. City of Huntington, 114 W. Va. 40, 171 S.E. 539; Finlayson v. City of Shinnston, 113 W.Va. 434, 168 S.E. 479; Herold v. Townsend, 113 W.Va. 319, 169 S.E. 74.
In the Berry case, in which Article X, Section 1, of the Constitution of this State, known as the Tax Limitation Amendment of 1932, was considered by this Court, the majority opinion written by Judge Maxwell, states:
"The underlying purpose of written constitutions is that there may be a safe and definite harbor for the ship of state in times of tempest. Great tribulations of government do not arise in periods of administrative calm. They manifest themselves when the clouds are heavy. It is then that a constitution proves its worth in preserving for the people those fundamental principles of free government which are indispensable to the well-being of our democratic institutions.
"If organic law be subverted through expediency, the basic guaranties of liberty are thereby imperiled. This truth is recognized and stated in our Constitution itself in dignified and forceful phraseology:
"`The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism.' Sec. 3, Art. I, Const. W.Va."
As to the supremacy of the provisions of the Constitution of the United States, Chief Justice Marshall in Marbury v. Madison, 5 U.S. (1 Cranch) 137, at page 175, 2 L.Ed. 60, used these pertinent words: "This original and supreme will organizes the government, and assigns to different departments their respective powers." which apply equally to the Constitution of this State.
In 4 M. J., Constitutional Law, Section 21, the text is in this language: "The Constitution of the United States was adopted by the whole people of the United States and is a grant of powers acquiesced in by the states themselves; hence, the constitution, and the laws passed by Congress in pursuance thereof, are the supreme law of the land. Next in order of supremacy come the state constitutions, the provisions of which are absolutely binding upon all the departments of the state government. The legislature has no power to pass laws in conflict with either state or federal constitutions. As has been said `the constitution is law to the lawmakers.'"
With reference to the fundamental and basic character of a State Constitution and in discussing the well established and universal importance and effect of a State Constitution, the text in 16 Am.Jur.2d, Constitutional Law, Section 56, contains these pertinent statements:
"A written constitution is not only the direct and basic expression of the sovereign will, it is also the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it, and must control as it is written until it is changed by the authority which established it. No function of government can be discharged in disregard of or in opposition to the fundamental law. The state constitution is the mandate of a sovereign people to its servants and representatives. No one of them has a right to ignore or disregard its mandates, and the legislature, the executive officers, *795 and the judiciary cannot lawfully act beyond its limitations.
"The constitution of each state, so far as it is consistent with the provisions of the Federal Constitution, is the fundamental law of the state and a part of its supreme law, * * *.
"A state constitution is equally binding on the political subdivisions and courts of the state, and on every officer and every citizen. Any attempt to do that which is prescribed in any manner other than that prescribed or to do that which is prohibited is repugnant to that supreme and paramount law and is invalid."
To show the utter lack of authority and the palpable absurdity of the decision in this case it is only necessary to envision the consequences of the present decision if it is a valid one, which I emphatically deny. The decision strikes down and nullifies provisions of the organic law which creates, maintains and preserves the government of this State which can not exist and function effectively as a sovereign governmental entity if the integrity of the Constitution as a whole is impaired or destroyed. I submit that in the absence of a decision of the Supreme Court of the United States invalidating any part of the Constitution of this State, that Constitution can not be valid in part and invalid in part but that is the logical result of the holding in this case and that result, to me, is utterly unacceptable.
Furthermore, if the two provisions of the Constitution declared to be invalid by the present decision are, in fact, invalid, so also, in principle and in logic, are all other provisions of the Constitution which require a two-thirds or a three-fourths vote to accomplish the intended result. There are a number of such provisions and all of them, in principle, under the holding of the majority, are invalid. Some, if not all, of these provisions are:
Section 9, Article IV, relating to impeachment of a state officer, states, in part, that "The senate shall have the sole power to try impeachments, and no person shall be convicted without the concurrence of two-thirds of the members elected thereto.";
Section 19, Article VI, relating to convening of the legislature by the governor, states, in part, that "It shall be his duty to convene it, on application in writing, of three-fifths of the members elected to each house.";
Section 22, Article VI, relating to legislative sessions, states, in part, that "During any thirty-day session the legislature shall consider no other business than the annual budget bill, except such as may be stated in a proclamation issued by the governor at least ten days prior to the convening of the session, or such business as may be stated by the legislature on its own motion in a concurrent resolution adopted by a two-thirds vote of the members elected to each house. All regular sessions may be extended by the concurrence of two-thirds of the members elected to each house.";
Section 29, Article VI, relating to requirement for reading bills, states, in part, that "No bill shall become a law, until it has been fully and distinctly read, on three different days, in each house, unless, in case of urgency, by a vote of four-fifths of the members present, taken by yeas and nays on each bill, this rule be dispensed with: * * *.";
Section 30, Article VI, relating to time acts take effect, states, in part, that "And no act of the legislature, * * *, shall take effect until the expiration of ninety days after its passage, unless the legislature shall by a vote of two-thirds of the members elected to each house, taken by yeas and nays, otherwise direct.";
Section 7, Article X, relating to duties of county authorities in assessing taxes, states that "County authorities shall never assess taxes, in any one year, the aggregate of which shall exceed ninety-five cents per one hundred dollars valuation, except for the support of free schools; payment of indebtedness existing at the time of the *796 adoption of this Constitution; and for the payment of any indebtedness with the interest thereon, created under the succeeding section, unless such assessment, with all questions involving the increase of such aggregate, shall have been submitted to the vote of the people of the county, and have received three-fifths of all the votes cast for and against it."; and
Section 2, Article XIV, relating to amendments of the Constitution, states, in part, that "Any amendment to the Constitution of the State may be proposed in either house of the legislature; and if the same, being read on three separate days in each house, be agreed to on its third reading, by two thirds of the members elected thereto, the proposed amendment, with the yeas and nays thereon, shall be entered on the journals, * * *."
Moreover, if the decision of the majority in this proceeding is valid, and I again emphatically assert that it is not, the Constitution of this State, instead of being altered or amended by the people of this State by the exercise of their exclusive rights so to do, can be invalidated in any of its provisions if, in the opinion of three members of this Court, any such provision is, or provisions are, contrary to, in conflict with, or violative of the Constitution of the United States. I submit that such result was not only never intended but was not even envisioned by the people of this State when they ratified the present Constitution, and that no such result was ever intended by the people of the United States when they ratified the Federal Constitution. Any such result violates the fundamental constitutional principle as stated by the great Chief Justice of the United States, John Marshall, in 1821, in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, at page 389, 5 L.Ed. 257, in this language: "The people made the constitution, and the people can unmake it. It is the creature of their will, and lives only by their will." Though the Chief Justice was speaking of the Federal Constitution, his above quoted pronouncement directly applies to the Constitution of this State and the application of that principle prohibits absolutely any alteration, amendment, or action to invalidate the Constitution of this State by any agency of this State, for only the people themselves possess and can exercise that power.
With respect to the effect of the current decision, I am frank to say that notwithstanding my experience of more than a half century as a member of the legal profession and for more than a quarter century as a judge of a Circuit Court and of the Supreme Court of Appeals of this State, I never expected to see the day when any court of this State would formally undertake to declare unconstitutional any provision of the organic law of this State; and I feel that the great majority of the people of this State share my feeling of amazement, surprise and disbelief with respect to the present decision. Furthermore, I submit that those persons, few in number, who on television and by radio hailed the decision with expressions of delight and characterized it as wonderful, when they realize the effect of the present decision upon the governmental structure of this State and upon the rights of the people under their Constitution, will be prone to change their expressions of delight to expressions of apprehension and alarm. I favor all possible and proper aid to education and, if I had been eligible to vote in Roane County, I would have voted to authorize the issuance of the bonds which a sufficient number of the voters of that county refused to authorize at the recent election; but I am unwilling to further the cause of education at the expense of destroying the integrity or impairing the validity of the fundamental law of this State.
The worst and most disturbing and disastrous feature of the present decision, in addition to its harmful effect upon the constitutional structure of this State, is the realization that if this Court has the power and authority to invalidate the two provisions of the Constitution here involved, it can, whenever it sees fit to do so, under the guise that they violate the Constitution *797 of the United States, invalidate any other provision or all of the provisions of the Constitution and by so doing impair and destroy the integrity of the constitutional structure of this State. That it may never do so does not remove or set at rest the threat that it can exercise the power which according to the present decision it now possesses. I submit that those who framed and ratified the Constitution of the United States and the Constitutions of the various states of the Union never intended, or even imagined, that any court created by any of those Constitutions would ever claim to possess or exercise and usurp any such unlimited power.
Of course, as stated in the majority opinion, the provision of Article VI of the Constitution of the United States that "This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.", is the supreme law of the land. This provision, however, as I have demonstrated, has no application to the two constitutional provisions under consideration in this case. It is clear that no treaty relates to either of those constitutional provisions. It is equally clear that no law of the United States made pursuant to the Constitution which, of course, means acts or resolutions of Congress, as the Supreme Court does not make but instead interprets and declares the law, applies to or is inconsistent with either of such constitutional provisions. Whether the Supreme Court of the United States may invalidate the constitutional provisions in question is not involved and need not be considered in this proceeding, other than to say that it has not, in any reported case, declared such provisions to be unconstitutional. But conceding that the Supreme Court of the United States may declare such provisions unconstitutional, it does not follow that this Court can do so or can exercise any of the powers of that Court. Nor is either of the constitutional provisions inconsistent with or violative of any provision of the Constitution of the United States or of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States which is the constitutional provision on which the majority relies in reaching its conclusion in this proceeding.
That there is no conflict or inconsistency between the two constitutional provisions here involved and the Equal Protection Clause of the Fourteenth Amendment is clearly established by the existence of numerous similar provisions of the Constitution of the United States by which a two thirds vote or a three fourths vote is required to accomplish the intended and sought for result. Some, if not all, of these provisions in the Federal Constitution are:
Article I, Section 3, relating to impeachments, states, in part, that "And no Person shall be convicted without the Concurrence of two thirds of the Members present.";
Article I, Section 7, relating to the passage of bills and resolutions, states, in part, that "If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law."; and "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary * * * shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.";
Article II, Section 2, relating to the powers of the President, states, in part, that "He shall have Power, by and with the Advice and Consent of the Senate, to make *798 Treaties, provided two thirds of the Senators present concur;"; and
Article V, relating to Amendments to the Constitution, states, in part, that "The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress;".
There is no conflict or inconsistency between the above quoted constitutional provisions and the Equal Protection Clause of the Fourteenth Amendment and all such provisions are, of course, valid and effective. I submit that if there is no conflict or inconsistency between such provisions of the Federal Constitution and the Equal Protection Clause, and no court has ever indicated that there is any such conflict or inconsistency, it necessarily follows that there is no inconsistency between the Equal Protection Clause and the two constitutional provisions here involved and the other provisions of the Constitution of this State which are similar to the quoted provisions of the Constitution of the United States, all of which require more than a majority vote to resolve a particular question in the accomplishment of the intended result. In the absence of any such conflict or inconsistency, the two constitutional provisions are not unconstitutional as violative of any provision of the Constitution of the United States or the Amendments to it and in consequence can not be validly held to be unconstitutional by any decision of this Court. It is impossible for me to understand how provisions of the Constitution of this State which are similar or identical with valid provisions of the Constitution of the United States can be held to be unconstitutional as violative of that Constitution. There is no presumption or determination of the unconstitutionality of those provisions in the absence of a decision of the Supreme Court of the United States holding such provisions to be unconstitutional as violative of the provisions of the Constitution of the United States or the Due Process and Equal Protection Clauses of the Fourteenth Amendment and, as heretofore stated, there has been no such decision of the Supreme Court of the United States or any decision by it which can reasonably be construed to apply to and render unconstitutional the two constitutional provisions involved in this case.
The contention that no conflict or inconsistency exists between the two constitutional provisions in question and the Equal Protection Clause was presented and urged upon this Court in the argument of this case but was summarily dismissed, without adequate study or consideration, as "frivilous and wholly beside the point." Such action was unfortunate. The contention deserved a kinder fate and if it had been properly considered would, or, at least, should have prevented the erroneous and unfortunate decision in this case. The analogies between the two constitutional provisions in question and other provisions of the Constitution of this State and similar provisions of the Constitution of the United States which require more than a majority vote to accomplish the intended result are not mentioned or presented as a challenge to the constitutionality of those provisions in the Federal Constitution, which, of course, can not be seriously asserted but are mentioned to show that as those provisions are constitutional and valid, similar provisions in the Constitution of this State are likewise constitutional and valid. And this issue was not even considered by the majority.
As the two constitutional provisions in question are not violative of the Equal Protection Clause or of any provision of the Federal Constitution, the provisions of the supremacy clause of that Constitution that the judges in every state shall be *799 bound by that Constitution, do not authorize or empower this Court in the first instance to invalidate either of the two constitutional provisions. The meaning and the effect of that provision of the supremacy clause are that if a provision of the Constitution of any State is clearly violative of the Federal Constitution and such violation has been determined by a court of competent jurisdiction or such provision has been invalidated by any treaty or law of the United States or by any amendment to the Federal Constitution, the judges of such State shall, of course, adhere to and follow the Federal Constitution and the laws made pursuant to it and the treaties made under the authority of the United States, and shall reject and refuse to recognize as valid the Constitution and the laws of any State found to be in conflict with the supremacy clause. To do that is one thing. It is an entirely different thing for the Supreme Court of a State, in the first instance and before the invalidity of a provision of a State Constitution has been determined as indicated, to invalidate the State Constitution which creates such court or any provision of such Constitution.
The basic error in the decision of the majority in this case is the view that the two constitutional provisions in question are inconsistent with and violate the recently promulgated doctrine or principle of one person-one vote developed and applied by the Supreme Court of the United States in a series of cases beginning with Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663. In those cases the Court held that the courts have jurisdiction to determine the constitutionality of statutes which provide for the selection of legislators on the basis of unequal population apportionment, and has declared such statutes to be unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, and that seats in the legislative branch of a state government must be apportioned substantially upon a population basis and that political equality means one person-one vote. Some of the leading cases are Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821; Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481; Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; WM CA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632; Hearne v. Smylie, 378 U.S. 563, 84 S.Ct. 1917, 12 L.Ed.2d 1036; Pinney v. Butterworth, 378 U.S. 564, 84 S.Ct. 1918, 12 L.Ed.2d 1037; and Hill v. Davis, 378 U.S. 565, 84 S.Ct. 1918, 12 L.Ed. 2d 1037.
In fact and in law, and contrary to the view of the majority, the two constitutional provisions in question are not inconsistent with the one person-one vote principle and that principle was not disregarded or violated at the school bond election in Roane County in which the proponents of the additional levy and the bonds failed to obtain a vote of sixty per cent in favor of the levy and a vote of three-fifths in favor of the bonds. The holdings in all the above cited cases, except Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632, involved the constitutionality of legislative apportionment schemes or plans adopted by several states of the Union, and such holdings are not applicable to the case at bar. In each of those cases the apportionment of seats in one or both houses of a state legislature was declared to be violative of the Equal Protection Clause of the Fourteenth Amendment on the ground that the apportionment on a population basis with respect to different political subdivisions of the state was unequal and that a person's right to vote for State legislators was unconstitutionally impaired when its weight was substantially debased or diluted in comparison *800 with votes of citizens living in other subdivisions of the state.
In the Reynolds case, cited and relied upon by the majority, it appeared, among other conditions, that in certain senatorial districts and counties of the State of Alabama, under statutory enactments, population variance of ratios of up to about fortyone to one existed in the senate and up to about sixteen to one existed in the house; that in Bullock County with a population of 13,462 and Henry County with a population of only 15,286, each county was allocated two seats in the Alabama House, whereas Mobile County with a population of 314,301 was given only three representatives and Jefferson County with a population of 634,864 had only seven representatives, and there was a similar inequality in the senatorial apportionment. In that situation it was clear that the vote of the citizens of Mobile County with 314,301 people and of Jefferson County with 634,864 people was greatly outweighed and diluted in comparison with the weight of the vote of the citizens of the smaller Counties of Bullock and Henry.
When the Court in those cases referred to the debasement of the right to vote caused by the malapportionment of the legislative apportionment plan it referred to a situation which did not exist in any respect in connection with the levy and the bond election vote under the constitutional provisions involved in this case. In that election there was no debasement or dilution of the vote of any voter who cast a vote for or against the levy or the bonds and no voters were disqualified. The question of apportionment on any population basis was not involved or considered and the requirement of one person-one vote was fully complied with and satisfied. Each voter in that election cast one vote and each vote so cast was counted as one vote of one voter. The only thing of which the plaintiffs in this proceeding can complain is that they and those associated with them who favored the authorization of the levy and the bonds did not get enough votes to win the election. The issue here involved is as simple as that and is the only issue involved. It is pertinent to observe, also, in all the cases cited, except the Lucas case, that the apportionment plan was created by statute and the validity of any constitutional provision of that kind was not involved. Of course, in those instances the Equal Protection Clause was violated but there was no such violation in connection with the levy and the bond election under the constitutional provisions that required a sixty per cent vote to authorize the levy and a three-fifths vote to authorize the issuance of the bonds.
In the Gray case, cited in the majority opinion, a legislative apportionment plan relating to the selection of state legislators of the State of Georgia, known as the County-Unit System under which the votes of persons living in large counties were given no more weight than the weight given to fewer votes of persons living in small counties, was involved; and in the Wesberry case a state statutory apportionment plan, relating to the selection of congressmen in the State of Georgia, was likewise involved. In the Wesberry case the Court held that one man's vote in a congressional election must be worth as much as another's vote in such election. In short the one person-one vote principle was designed to secure equal representation on a population basis, and that question is not pertinent or involved in connection with the Roane County school bond election.
The rule of the above cited apportionment cases does not apply to or recognize any debasement or dilution of the votes of the citizens in each area among themselves and within that area, for the vote of each citizen in each area is of equal weight in the selection of their representatives. Accordingly, I repeat, those cases do not apply to the votes cast at the Roane County school bond election for the reason that no issue of apportionment with respect to the selection of any governmental representative on an unequal population basis, or no issue of the comparative value of the votes *801 cast is involved. Each person who voted at that election cast one vote and that one vote was duly counted and was given the value of one vote of one person. The one person-one vote principle was complied with fully and the inability of those who failed to obtain enough votes to win the election was not due to any debasement or dilution of their vote but was due to the lack of enough affirmative votes to win the election. The votes cast by the individual voters were counted alike and all of them were of equal weight and value.
Furthermore, none of the apportionment cases produced or applied a formula like the formula conjured up by the plaintiffs and applied by the majority in this case by which a single negative vote at an election in which sixty per cent or three-fifths of the votes cast is required to win the election is given the weight or the value of one and one-half times a single affirmative vote or by which negative votes were evaluated on the basis that two minority votes were equal to three affirmative votes. By that formula one affirmative winning vote, even in an election in which only a majority vote is required to win and in which there are 5999 affirmative votes and 4000 negative votes or a total of 9999 votes, would be given the weight and value of one and one-half times one negative vote and two affirmative votes would be given the weight and value of three negative votes and, in consequence, the negative votes would be illegally debased and diluted to that extent. This hypothesis shows the utter unreliability of and the obviously fallacious result that could be accomplished by a formula that could invalidate any election whether conducted on a sixty per cent or a majority vote basis. By such a formula the unanimous vote requirement for a verdict of a jury could be invalidated because the vote of one dissenting juror can outweigh the combined votes of the other eleven jurors and the traditional unanimous consent rule could be abrogated because the vote of one dissenting member can outweigh the votes of all the other members. No decision of any court other than the decision in the case at bar, to my knowledge, has recognized or applied any such arbitrary or capricious method of evaluating votes in determining the result of an election.
The New Mexico case of State ex rel. Witt v. State Canvassing Board, 78 N.M. 682, 437 P.2d 143, cited in the majority opinion, was also an apportionment case and involved an apportionment of the votes of the citizens of the various counties of that state on a grossly unequal population basis in an election to amend a provision of the Constitution of that state. The court in that case applied the one person-one vote principle of the Federal apportionment cases to an election to amend a provision of the Constitution of that state and held that the constitutional requirement of a two thirds vote in each county to amend the provision of the Constitution of that state relating to the elective franchise, was violative of the one person-one vote principle and unconstitutional for that reason. That case is clearly inapplicable to the case at bar; but whatever may be the effect of the holding in that case, it is not binding authority on this Court and it is not even persuasive authority for me. It may be of interest to state, however, that the same New Mexico Court that decided the Witt case and invalidated a provision of the Constitution of that state, said, as I say in this case, that when a proposal to amend a Constitution to abolish a state office was defeated at the polls by the people, to sanction legislative repeal of that office, just as it is to sanction invalidation in that situation by a State court decision, would thwart the constitutional provision and defeat the will of the people as expressed at the polls. Thompson v. Legislative Audit Commission, 79 N.M. 693, 448 P.2d 799.
The majority opinion cites and relies on the cases of Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675; Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583; and Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647. *802 Each of those cases is utterly inapplicable to the case at bar. In each of them a particular group of citizens was excluded from the exercise of the elective franchise and in each case the Supreme Court of the United States held that the state constitutional provision or the statutory provision effecting such exclusion was invalid. It is perhaps unnecessary to point out further the inapplicability of any of those decisions to the case at bar but, to indicate the difficulty experienced by the majority in attempting to find a pertinent citation of authority on which to rest its unprecedented decision in this case, I shall show that none of those decisions has any present application.
The Carrington case dealt with a provision of the Constitution of the State of Texas which permitted a military serviceman to vote only in the county where he resided when he entered the service. The petitioner was a member of the armed services who had moved to Texas in 1962. He was a resident of and intended to make his home in that state. Under the foregoing constitutional provision he was denied the right to vote. The Supreme Court of Texas held that constitutional provision to be valid but on certiorari the Supreme Court of the United States reversed and held that though a state can impose reasonable residence requirements for voting, it can not, under the Equal Protection Clause deny a ballot to a bona fide resident merely because he is a member of the armed services. In the opinion the Court said: "We recognize that special problems may be involved in determining whether servicemen have actually acquired a new domicile in a State for franchise purposes. We emphasize that Texas is free to take reasonable and adequate steps, as have other States, to see that all applicants for the vote actually fulfill the requirements of bona fide residence. But this constitutional provision goes beyond such rules. * * *. All servicemen not residents of Texas before induction come within the provision's sweep. Not one of them can ever vote in Texas, no matter how long Texas may have been his true home. `[T]he uniform of our country * * * [must not] be the badge of disfranchisement for the man or woman who wears it.'" Manifestly the decision of the Supreme Court of the United States, not the Supreme Court of Texas, that the constitutional provision which disfranchises a particular group of citizens was unconstitutional, has no application whatsoever to the case at bar. No citizen who voted at the Roane County school bond election was disqualified from voting and why the Carrington case is cited by the majority is a mystery to me.
In the Kramer case a New York statute provided that three classes of persons were qualified, under the law of that state, to vote in school elections: (1) Parents or guardians of children attending public schools within the district; (2) persons who own taxable real property within the district, and their spouses; (3) persons who lease taxable real property within the district, and their spouses. The applicant in that case, a bachelor who lived with his parents and who neither owned nor leased any real estate within the district and, not being within any of the three classes, was disqualified from voting despite the fact that he met the general age and residence requirements imposed by state law. The court held the statute to be violative of the Equal Protection Clause of the Fourteenth Amendment and to be unconstitutional. For the reason indicated in connection with the Carrington case, the decision in the Kramer case is clearly inapplicable to the case at bar.
In the Cipriano case, a Louisiana statute permitted only "property taxpayers" to vote in elections called to approve the issuance of revenue bonds by a municipal utility. This disqualifying statute was held to be unconstitutional not because it debased or diluted the vote of any person but because it arbitrarily disqualified a person from voting in a municipal bond election who was otherwise duly qualified to vote in other elections. The statute also disqualified *803 6926 other non-property taxpayers who were qualified voters in the City of Houma. The decision in this case closely resembles the Kramer case and is, for the same reason, utterly inapplicable to the case at bar. This manifestly inapplicable decision was cited in the majority opinion for the unconvincing stated reason that "We deem this decision in point because it dealt with a local election and the rights of voters in an election dealing with the issuance of municipal bonds as distinguished from an election to nominate or elect public officials." I can detect not even a remote connection between the question of the authorization of an issue of municipal bonds at a local election and the applicability or the non-applicability of the one person-one vote principle in evaluating the votes cast at such an election and, as already indicated, that question was not involved or considered in the election dealt with in the Cipriano case.
The action of the majority of this Court, in glorifying and clothing with omnipotence a majority vote in any election and in proscribing any requirement of a two thirds or a three fourths vote to accomplish the intended result, shows a surprising lack of consideration of one of the fundamental functions or basic purposes of a written constitution for any governmental sovereign, whether such sovereign is the Nation or a State of the Union. That function or purpose is, of course, to protect the individual against the power of government and to safeguard the minority against the tyranny of the majority, which by its power can generally achieve its political and governmental objectives, and to prevent the majority from usurping or destroying the rights of the minority. Such restraint upon the unlimited power of the majority is a salutary and essential restraint and is a valid constitutional limitation as evidenced by provisions of that nature in the Constitution of the United States and in every state Constitution.
The text in 16 Am.Jur.2d, Constitutional Law, Section 4, discusses these universally recognized characteristics of a written constitution in this language: "The term `constitution' implies an instrument of a permanent and abiding nature. A constitution, unlike a statute, is intended not merely to meet existing conditions but also to govern the future. Although this characteristic of a written constitution may at times obstruct progress, its stability is intended to protect the people from frequent and violent fluctuations of public opinion, since the constitutions, state and federal, are limitations on the power of the people as against the impulses of mere majorities." Section 6 of the same authority, with respect to functions of constitutions generally, contains these statements: "Perhaps the most important of the fundamental functions of a constitution is to establish the basis of the governmental system, that is, to prescribe the permanent framework of the system of government, assign to the different departments their respective powers and duties, and establish certain fixed first principles on which government is founded."
By its unwarranted exaltation of the rule of the majority in this instance, the majority has reached an inconsistent and, to me, an intolerable result. In proclaiming the supremacy of the majority in the Roane County school bond election, it has permitted five dissatisfied, defeated and frustrated citizens and taxpayers of that county who cast affirmative majority votes in that election, with the aid of this Court, to thwart, defeat, and overcome the express will of a majority of the voters of this State who, less than three years ago, by a vote of 212,883 to 206,542, or a majority of 6341 votes, at the state wide general election in 1966, refused to ratify an amendment which would have removed the three fifths vote requirement from the Constitution of this State. By its decision, the majority of this Court, contrary to the recently expressed will of the majority of the voters of this State, now invalidates the three fifths vote requirement of the Constitution in the name of the Equal Protection Clause of the Fourteenth Amendment. *804 Of course, I can not sanction, subscribe to, or concur in any such result.
In recent years the Supreme Court of the United States has been widely criticized and charged with changing the Constitution of the United States by its interpretation of some of its provisions to give them a meaning not justified by the language of the Constitution. Now, unfortunately, for the first time, this Court, by the tortured and unwarranted application of the one person-one vote principle to a situation to which it clearly does not apply, and by invalidating clearly valid provisions of the fundamental law of this State which its people want retained in force and effect and are unwilling to change, becomes vulnerable to the same type of criticism. This I deeply regret and deplore.
At the expense of the invalidation of two provisions of the Constitution of this State and the threat of the invalidation of other provisions of that basic law, it can now be truly said that it is hard and expensive to obtain an education in West Virginia. A much easier, less expensive, less hazardous and a more acceptable and orderly way to obtain such an education would be for the people of this State to amend these now invalid provisions of our State Constitution by their vote in the manner provided by Article XIV of that fundamental law. Until they are so amended or until in an election three fifths of the voters of a particular county express their wish for a bond issue or sixty per cent of the voters of such county express their wish for the additional tax levy, the minority of less than three fifths of the voters and sixty per cent of the voters in that area should not, in a free society, be forced to accept the tax burdens and to pay for such bonds. Instead they should be persuaded, as I think they can be, to authorize the levy and the bonds in accordance with the provisions of Article X, Sections 1 and 8, of the Constitution of this State.
I would affirm the judgment of the Circuit Court of Roane County and dismiss this consolidated action at the cost of the plaintiffs.

On Rehearing
CALHOUN, Judge.
On the rehearing of this consolidated action, heretofore granted for the limited purpose of considering the motion of A. T. Gordon and others for permission to intervene and be made parties defendant hereto, upon full consideration of the motion, as amended, such motion is sustained and the movants are permitted to intervene and to be made defendants to this consolidated action. The rehearing having been granted for the limited purpose of considering the motion to intervene, the Court refuses to reconsider or modify its holding on the merits and accordingly the final judgment rendered July 8, 1969, upon the merits, is reaffirmed without change or modification in any respect, other than to grant the motion, as amended, to permit the movants to intervene and to be made parties defendant to this consolidated action. Accordingly, the original opinion and the prefixed syllabus points are approved, adhered to and adopted as the decision of this Court in this proceeding and the judgment of the circuit court indicated in the original opinion is reversed and this action is remanded to that court.
Reversed and remanded.
HAYMOND, President (dissenting):
I concur in the action of the Court in granting the motion to intervene and in permitting the movants to be made defendants to this consolidated action but I dissent from the majority opinion on the rehearing of this action in refusing to reconsider or modify its holding on the merits and in affirming its final judgment of July 8, 1969, and I adopt, without change or modification, the dissenting opinion heretofore filed by me in this proceeding.